Daniel **LATINO** and Robert Slawinski,
Plaintiffs–Appellees,

v.

Edward **KAIZER** and City of Chicago,
Defendants–Appellants.

Nos. 94–3237 and 94–3550.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1995.

Decided June 22, 1995.

Rehearing Denied July 12, 1995.

Leon E. Lindenbaum (argued), Lindenbaum, Coffman, Kurlander, Brisky, & Hayes, Chicago, IL, for plaintiffs-appellees.

Martha R. Barglow, Lawrence Rosenthal, DCC, John F. McGuire, ACC, Benna R. Solomon, Alec M. McAusland, Melvin L. Brooks, Julian Henriques (argued), Susan S. Sher, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for defendants-appellants.

Before EASTERBROOK and KANNE, Circuit Judges, and SHARP, Chief District Judge.*

\* Chief District Judge Allen Sharp, Northern District of Indiana, sitting by designation.

1. The plaintiffs alleged that the assisting officer was Officer William Gordon, but Officers Michael Scornavacco and Kaizer testified that Scornavacco was the assisting officer, and Gordon testified that he was in no way involved. The second jury found in favor of Officer Gordon as had the first, and plaintiffs-appellees have not appealed that finding.

SHARP, Chief District Judge.

The defendants-appellants, police officer Edward Kaizer and the City of Chicago, appeal a jury award of damages against them in favor of plaintiffs-appellees Daniel Latino and Robert Slawinski for arrest without probable cause and false imprisonment. The plaintiffs' jury award came after the second trial in this case; the first jury trial found in favor of the defendants, but that verdict was vacated by the district judge on a post-trial motion under Federal Rule of Civil Procedure 59. The second jury awarded the plaintiffs $5500.00 each, and the district judge then awarded plaintiffs $120,113.50 in attorney fees and $1,019.34 in expenses under 42 U.S.C. § 1988, 864 F.Supp. 835.

Latino and Slawinski sued Chicago and two officers, Kaizer and William Gordon, under the state common law tort of false imprisonment and 42 U.S.C. § 1983 for alleged violations of their Fourth and Fourteenth Amendment rights. The plaintiffs were arrested by Officer Kaizer and an undetermined [1] second officer on June 2, 1991 for ticket scalping [2] at the first Bulls–Lakers game in the final round of the NBA playoffs. All agree that the arrest occurred the night of June 2, 1991 outside the Chicago Stadium, but there ends the similarities between the parties' stories.

The jury in the first civil trial found against the plaintiffs in favor of defendants, but the district judge granted the plaintiffs' post-trial motion and vacated the jury's verdict. In so doing he found that the officers' version of events was perjury, and absent that testimony, the jury's verdict for the defendants was against the weight of the evidence. Because this court finds that the first jury verdict should not have been vacat-

2. Latino and Slawinski were charged with ticket speculation in violation of Municipal Code of Chicago, Ill. § 10–8–500 (1990). They were given a trial date of July 24, 1991. They appeared and requested a continuance, which was granted. Officer Kaizer appeared at the first trial date but states that he was never informed of the second date, and so he did not appear. In the absence of officer testimony, on August 14, 1991 the judge dismissed the quasi-criminal complaint.

ed, it reinstates that verdict in favor of the defendants.

### Police Officers' Testimony

This case boils down to a swearing contest between the police officers and the plaintiffs. Officers Kaizer and Scornavacco testified that they were undercover at the Stadium, assigned to patrol on foot before the game to apprehend pickpockets and ticket scalpers. The officers spotted Latino and Slawinski on the north side of Madison Street walking west toward Gate 1 of the Stadium building, each holding something in his hand. The officers separated and crossed the street after the plaintiffs. Kaizer stated that he saw Latino and Slawinski stopped by a couple of people in front of Gate 1, and he walked over and joined the group. Latino and Slawinski were standing side-by-side, and each was holding a pair of tickets.

While Officer Scornavacco walked about 10 to 15 feet behind the plaintiffs, Kaizer heard someone in the crowd ask, "Well, what kind of seats are they?" Both plaintiffs replied that they were good seats. Kaizer then heard someone ask, "How much are they?" He did not hear the reply, but did hear someone comment "I don't want to pay that." Officer Kaizer repeated the question himself, asking Latino and Slawinski "How much are they?" Latino responded "$150." Officer Kaizer then looked at Slawinski and asked, "And yours?" Slawinski responded "$150" as well.

Officer Kaizer then announced that he was a police officer and that he was arresting them for ticket speculation, showed his badge, and placed a handcuff on Latino's right wrist. Officer Scornavacco walked up and placed the other half of the handcuffs around Slawinski's left wrist, handcuffing the plaintiffs together. Officer Kaizer then asked them for their tickets. Kaizer took two tickets from Latino, and Scornavacco took two from Slawinski. Kaizer then asked for their identification, and both produced wallets and drivers' licenses with their free hands. Kaizer and Scornavacco then walked the plaintiffs south across Madison Street into the parking lot and turned them over to a sergeant.

After the game started around 2:30 p.m., the officers left the stadium for the Thirteenth District police station. While Officer Kaizer processed the arrestees, he removed the confiscated tickets from his pocket and separated them from the identification cards, and placed them in individual inventory envelopes assigned to each arrestee. Latino and Slawinski were then locked up and were later released on recognizance bonds.

### Plaintiffs' Testimony

The plaintiffs' version of events was strikingly different. At the time of his arrest, Latino was Director of Alcoholic Beverages for the Phar–Mor Drug Company. He testified that as of the morning of June 2, 1991, he had received two tickets for the game from a Phar–Mor supplier. Latino invited Slawinski (his tennis partner and an area sales manager for an alcoholic beverage distributor) to attend the game with him. They met Latino's boss, Phar–Mor CEO Mickey Monus, and approximately eight other people associated with Phar–Mor for lunch at Pizzeria Uno near downtown Chicago.

Monus took the tickets from the people at the luncheon and redistributed them. Monus took Latino's two tickets, but gave him back four. He informed Latino that the extra two tickets should be given to buyers from Phar–Mor or others in the industry.

Latino and Slawinski drove in Latino's car to the stadium, arriving at approximately 1:00 p.m. Latino testified that he left his wallet and identification in his car. Slawinski testified that he had no wallet or identification. As the plaintiffs walked toward the stadium, they looked for but did not see anyone from Phar–Mor or Slawinski's company. Latino then spotted an acquaintance, Richard Scrima, in a parking lot on the south side of Madison Street. They crossed to the south side of the street and Latino went up to Scrima; Slawinski stopped about ten or twenty feet before Latino did.

Latino informed Scrima that he had extra tickets to the game, and asked him whether he had seen anyone from the industry, or for any suggestions about what to do with his

extra tickets. Scrima testified that he offered to buy the tickets, but Latino refused.

Latino testified that Scrima asked him if he could help out Scrima's acquaintance who was standing there. The man pulled out two tickets, and asked whether Latino would "trade up" tickets. Latino refused, turned, and walked away. Interestingly, Scrima testified that he did not remember introducing anyone to Latino, or the encounter about which Latino testified.

Just after Latino walked away from Scrima he was tapped on the shoulder by Officer Kaizer, who told him he was under arrest for scalping and cuffed his right wrist. Kaizer led Latino toward Slawinski (who then was standing not more than ten feet away). At this point Scrima noticed that Latino had been arrested, and stated that this had all occurred in about 25 or 30 seconds. Slawinski walked towards Latino, and was asked by another plainclothes officer (either Gordon or Scornavacco) if he knew Latino. When Slawinski said that Latino was a friend of his, the second officer cuffed Slawinski's left wrist to the other end of the cuff on Latino's right wrist.

Officer Kaizer asked Latino for identification and Latino told him it was in his car. Kaizer asked how many tickets he had, and Latino replied four. Kaizer did not request the tickets. Kaizer led Latino and Slawinski to the parking lot where they were turned over to another officer.

Slawinski testified that Kaizer did not ask for the tickets until they were at the station. When asked for them, Latino gave Kaizer all four. Slawinski said he had no tickets. Officer Kaizer paperclipped two tickets at random to Latino's form and two to Slawinski's.

### Post–Trial Motions

The jury in the first trial found in favor of the defendants, Officers Kaizer and Gordon and the City of Chicago. The plaintiffs filed post-trial motions under Rules 50 and 59 with the district judge, requesting a new trial. The district judge denied the Rule 50 motion for judgment as a matter of law. He acknowledged that the admissible evidence presented by the defense, if believed by the jury, supported the defendants' verdict. However, Judge Shadur granted a new trial under Rule 59, finding that the police officers' testimony was perjury, and when the perjurious testimony was stricken, the verdict was against the weight of the remaining evidence. The district judge also vaguely referred to defense counsel's closing as improper, saying that added "some further weight" to the decision to grant the new trial.[3]

### Discussion

The plaintiffs-appellees attempt to reargue the facts before this court and show that their version of events was more believable. Such is not our role. We must decide only whether the district judge properly vacated the first jury verdict. Judge Shadur has provided a clear, straightforward, and precise statement of his reasons for finding perjury and vacating the first jury verdict. This court must determine whether such action was appropriate.

The defendants did not appeal the district judge's grant of a new trial, but

---

**3.** Appendix 15–16. After the second trial, while discussing the defendants' post-trial motion, Judge Shadur again referred to the defendants' closing argument in the first trial. Trans. of Proceedings of Nov. 2, 1994 at 2–4. Judge Shadur was more strongly denunciative this time, referring to it as the "major vice" in the first trial. *Id.* at 3. However, the judge did not explain his problems with the closing argument.

Considering Judge Shadur's strong belief that the officers' testimony was perjury, and that any inferences argued therefrom were inherently improper, combined with the judge's prohibition against certain defense theories being argued in the second trial, it must be assumed that his primary reason for considering the first defense closing improper was that it argued improper inferences based on false testimony. Other deficiencies in the first closing were dealt with at the time with curative jury instructions.

Because we have determined that the testimony at issue was not inherently perjurious, and therefore the inferences based on it were not necessarily improper, we do not believe that "improprieties" in the first defense closing would warrant the grant of a new trial. Judge Shadur himself was fairly explicit that he would not have vacated the first jury verdict solely on the basis of defense counsel's improprieties during closing argument.

rather proceeded with the second trial. An order granting a new trial is not a final order within the meaning of 28 U.S.C. § 1291 and is therefore generally not immediately appealable. Nevertheless, after a new trial and entry of final judgment an appellate court entertaining an appeal from the final judgment may review the decision to grant a new trial and, where appropriate, reinstate the original verdict. *Juneau Square Corp. v. First Wisconsin Nat. Bank of Milwaukee*, 624 F.2d 798, 806 (7th Cir.1980), *cert. den.*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980).

Judge Shadur was firm in his belief that the two different versions of events in this case were not merely a "swearing contest" between the parties. App. 14. He believed that the officers' account of events was objectively and inherently improbable, and was therefore perjury. App. 14–15, 21–31. Judge Shadur believed that Officer Kaizer's testimony could lead only to the inference that Slawinski and Latino were attempting to sell all four of their tickets, and the judge could not believe that two men would make a special trip to the stadium to sell their seats to such "an extraordinary occasion" (despite the $600 profit at stake). App. 15. Judge Shadur also believed that the mismatched pairs of tickets (Latino supposedly was offering seats 16 and 17, and Slawinski had 15 and 18) "directly puts the lie to Officer Kaizer's version." App. 14. Judge Shadur found that the objective evidence "put the lie" to the officers' testimony, and it was therefore perjury. Excluding the officers' testimony, the verdict for the defendants was of course against the weight of the evidence. This court must determine whether Judge Shadur correctly applied the law in deciding to exclude the officers' testimony as perjury.

▪ Appellate review of a district court's order for a new trial is limited. Because the trial judge is uniquely situated to rule on such a motion, the district court has great discretion in determining whether to grant a new trial. *Forrester v. White*, 846 F.2d 29, 31 (7th Cir.1988); *see also Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1377 (7th Cir.1990); *Juneau*, 624 F.2d at 806. Therefore, in reviewing the new trial order, we do not seek to substitute our judgment for the trial judge's decision that a new trial was appropriate; "We seek only to determine whether he abused his discretion." *Fort Howard Paper*, 901 F.2d at 1377, *quoting Juneau*, 624 F.2d at 806.

▪ When the trial judge disagrees with a jury verdict, the Seventh Amendment's [4] limitations on the judge's power to reexamine the jury's verdict is implicated and a more exacting standard of review applies. *Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875, 888 (7th Cir.1986). Nonetheless, the district judge's determination still warrants substantial deference. *Id.* In cases involving simple issues but highly disputed facts (an apt description of this case), greater deference should be afforded the jury's verdict than in cases involving complex issues with facts not highly disputed. *Williams v. City of Valdosta*, 689 F.2d 964, 974 (11th Cir. 1982); *see also Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3rd Cir. 1991) ("Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations."). *Williams v. Valdosta* also notes that the *grant* of a motion for a new trial begs more stringent review than a denial, and a still more rigorous review when the basis of the motion was the weight of the evidence. 689 F.2d at 974.

This court traced the evolutionary history of the Seventh Amendment in *United States v. One 1976 Mercedes Benz 280S*, 618 F.2d 453 (7th Cir.1980). The boundaries of the trial judge *vis á vis* the jury function are well delineated in *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636 (1935).

---

4. "... [N]o fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. Amend. VII. These brief words in the Seventh Amendment are profound. Those who wrote them were keenly aware that the right to a trial by jury in civil cases had been undermined in the Navigation Acts before 1776, and the Seventh Amendment was a byproduct of those experiences.

■ Despite the deference to be accorded a district court's decision to grant a new trial, new trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience. *Williamson v. Consolidated Rail Corp.*, 926 F.2d at 1353.

In his oral ruling on November 16, 1993, Judge Shadur invoked the memory of a giant of the federal judiciary in a bygone era, Chief Judge John Barnes of the United States District Court in Chicago during the 1930s, '40s, and '50s. Chief Judge Barnes was a dynamic not-so-benevolent tyrant who ruled the district court in Chicago with an iron fist, sometimes but not always covered with a velvet glove. He was sometimes called "Old Iron Pants," which was not always a term of endearment. Judge Shadur noted that in a case in which the jury found against then-attorney Shadur's client, Chief Judge Barnes said essentially, "In these cases I sit as the 13th juror. As I listened to the evidence I was convinced that there was major perjury presented to the jury. Unfortunately, the jury didn't recognize it, but I grant a new trial because the jury verdict was against the manifest weight of the evidence." App. 12. The existence or not of the "13th juror rule" is a debate which need not be decided here. It is unlikely that even Chief Judge Barnes would have argued that a United States district judge has an absolute veto to set aside any civil jury verdict which that judge finds distasteful.

> There are statements in the cases that, in ruling on the motion, the trial judge acts as a 13th juror. Properly understood and applied, no fault can be found with them for the judge does act to evaluate and weigh the evidence. But while he has a responsibility for the result no less than the jury, he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict. And since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict.

*Williams v. City of Valdosta*, 689 F.2d at 973 fn. 7, *citing* Moore's Federal Practice, P 59.08(5), at 59–158–59. *See also Foster v. Continental Can Corp.*, 101 F.R.D. 710, 714 (N.D.Ind.1984), *aff'd*, 783 F.2d 731 (7th Cir. 1986).

■ The district judge can take away from the jury testimony that reasonable persons could not believe. *United States v. Kuzniar*, 881 F.2d 466, 471 (7th Cir.1989). However, that exception is a narrow one, and can be invoked only where the testimony contradicts indisputable physical facts or laws. *Id.; see also id.* at 471 fn. 1 ("[T]estimony which does not contradict the physical laws of nature cannot be shielded from the jury."). Judge Shadur stated quite clearly his belief that the officers' testimony in the case now before us fell within that narrow exception. With all deference, we can not agree.

On three separate occasions Judge Shadur very carefully set forth his reasoning for vacating the verdict in the first jury trial. His transcribed oral statements of reasons for granting a new trial were fully and carefully crafted with the ring of candor and intellectual honesty. It is precisely because of their excellence that we have full insight into the precise reasons for granting a new trial. It is more than a matter of semantics.

The district judge found that the officers' testimony was perjury and therefore should not have provided a basis for the jury's decision. Once he decided to exclude the officers' testimony, then of course the jury verdict for the defendants was against weight of the evidence.

Judge Shadur's finding that the police officers' testimony was perjury was not based on their demeanor. He very carefully and precisely set forth the basis of his finding, which was that the officers' story was inconsistent with his view of the physical evidence and was "at war with common sense." App. 24–25. Judge Shadur believed the officers' testimony was objectively and inherently improbable to the extent that they must be lying. This court is fully capable of reviewing that

basis, and finds that Judge Shadur's decision was an abuse of discretion.

■ The jury's verdict could only be disturbed under the narrowest of circumstances, which simply do not exist in this case. It does not contradict the laws of nature to believe that two men would rather receive $600 than attend a Bulls–Lakers game, and the district judge was not at liberty to effectively take that testimony away from the jury in deciding that the verdict was against the weight of the evidence. The court appreciates Judge Shadur's frustration at a jury verdict which he believed was based on a perjured account of events. However, it was the jury which had the duty to weigh the evidence, and we do not agree that the officers' testimony was so physically impossible or contrary to the evidence as to provide a legitimate basis for in effect excluding it from the jury's consideration.

Judge Shadur believed that there was no rational predicate for believing that Slawinski and Latino would go to the Chicago Stadium to sell all four tickets; he believed it to be inherently incredible. App. 25. This court can not agree. That scenario is at worst improbable, and the jury was justified in crediting it. Preferring to sell all of one's tickets for a steep profit rather than to actually attend a Bulls–Lakers game might seem inherently incredible to a diehard fan, but legally it is not so.

It must be remembered that Latino and Slawinski had lunched together with Latino's boss in downtown Chicago before the game. It was there that they were given the four tickets at issue. Judge Shadur believed Kaizer's account of Slawinski's and Latino's actions could only support the inference that all four tickets were for sale. Perhaps so. Perhaps at first they planned to go to the game, but later decided to sell all of the tickets when they realized how much money they could get for them. Such is not a metaphysical impossibility; in fact there are many likely reasons to decide to sell all four tickets. Unlike cases involving complicated legal concepts, many jurors would have personal experience with identical situations. The jurors were in the best position to decide the rationality or reasonableness of the scalping charge. Such a scenario can not be considered to be outside the realm of possibility, and Judge Shadur should not have overridden the jury verdict on that basis.

Notwithstanding, this court believes that Officer Kaizer's testimony could support the inference that the plaintiffs were only selling their extra two tickets, or that perhaps they had planned to sell only two but were toying with the idea of selling all four when faced with quick, easy money. Regardless, even if Judge Shadur was correct that the only permissible inference from Kaizer's testimony was that there were four tickets for sale, that simply does not create a manifestly unbelievable scenario. For $300 per pair, whether the men would choose to sell both pairs and watch the game in a bar or sell one pair and watch it in person, either scenario is well within the range of reasonable human behavior, and likewise within the experience and understanding of the jury.

■ As physical proof of his belief that the officers' story was contrived, Judge Shadur pointed out that the tickets each plaintiff purportedly held were not in sequential pairs—Kaizer had placed tickets 16 and 17 in Latino's file, and 15 and 18 in Slawinski's. Judge Shadur considered that to be physical evidence completely and objectively at odds with Officer Kaizer's depiction of the plaintiffs' actions. Judge Shadur believed that Officer Kaizer *must* have taken all four tickets from Latino, as Latino testified, but when he booked them he attached two tickets to Latino's form and two to Slawinski's, inadvertently dividing them into unmatched pairs. The judge refused to believe that Slawinski and Latino could have each been holding mismatched pairs at the time of their arrest. Judge Shadur had already decided, upon seeing the exhibit before it was even entered into evidence, that the mismatched tickets alone "utterly destroyed the credibility of Officer Kaizer's depiction." App. 14, 24.

The jury would not have been unreasonable in deciding that Latino or Slawinski might have mismatched the tickets inadvertently when they divvied them up between themselves, or that the tickets were mixed up while Officer Kaizer took them from the

plaintiffs and put them in his pocket before taking the plaintiffs to jail. Both sides put forth evidence on this issue and argued at length the inferences which could be derived from it. Defense counsel did a good job at presenting reasonable inferences based on the evidence which would explain the mismatched tickets without the necessity of contrivance on the part of the officers. Apparently, the jury may have agreed that the mismatched tickets did not destroy the officers' story or credibility.

 Judge Shadur also points out his belief that two men handcuffed together physically could not have retrieved their wallets and identification as Officer Kaizer testified. Again, such may be improbable, but certainly not physically impossible. Detainees have performed far more surprisingly deft acrobatics while shackled much more constrictedly. These men each had a free hand, and the other was only restrained in its range of motion, not its ability to grasp. Most men pull their wallets out with one hand then hold it still with the other while extracting their identification. There is nothing about Latino's or Slawinski's condition that would have necessarily prevented that.

Judge Shadur also pointed out that Richard Scrima corroborated the plaintiffs' version rather than the police officers'. Scrima is a truck driver in the liquor industry known to Mr. Latino. There are various reasons why Mr. Scrima might have lied in favor of Mr. Latino, none of them material here. The fact is the jury apparently disbelieved Scrima, and that decision was their function. Disbelieving Scrima certainly does not challenge the laws of nature.

The plaintiffs' closing argument well encompassed their evidence and theory of the case. However, the jury believed the defendants. With the greatest deference to Judge Shadur, there was nothing demonstrably untrue about the defendants' evidence. It did not, for example, require a realignment of the laws of nature. This was a credibility-based decision—a swearing contest. The evidence for each side was essentially equal; it was merely a matter of whom to believe. "And since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Williams v. City of Valdosta,* 689 F.2d at 973 fn. 7. The jury spoke its verdict, and the Seventh Amendment affords it very considerable deference.

Judge Shadur usurped the jury's role in deciding the most reasonable inferences from the evidence. That flies in the face of the Seventh Amendment, and goes beyond the power of the district judge under Rule 59. With all deference, the grant of a new trial in this case was an abuse of discretion. It must most respectfully be decided here that with all good intentions the district judge did indeed cross the boundaries when he determined that the jury should not have been permitted to credit the officers' testimony. The officers' testimony was not objectively false, and excluding it after the fact second-guesses the jury in a way that strikes at the very heart of the Seventh Amendment. Judge Shadur certainly must be commended for his intellectual honesty and candor, but this court must be equally intellectually honest and candid in saying that the boundary was indeed crossed. The grant of a new trial based on Judge Shadur's reasoning was a clear abuse of discretion, and cannot be upheld.

Therefore, the verdict in the first trial must stand, which obviates the necessity of dealing with the other issues which are here presented. On these bases, the decision to grant a new trial in the first trial is reversed, and this case is remanded with instructions to reinstate the jury's verdict for the defendants in the first trial.