In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2319

MANUEL GALVAN,

*Plaintiff-Appellant,*

*v.*

THOMAS NORBERG, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:04-cv-04003—**Edmond E. Chang**, *Judge.*

ARGUED APRIL 4, 2012—DECIDED MAY 7, 2012

Before EASTERBROOK, *Chief Judge*, and FLAUM and
MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. Manuel Galvan filed a § 1983
action against Chicago police officers Thomas Norberg
and Alan Lucas, seeking damages arising from a traffic
stop, a vehicle search, and an arrest. Galvan contends
that the officers lacked probable cause, whereas the
officers maintain that they were following up on an
anonymous tip that Lucas had received. After the jury

returned a verdict in favor of defendants Norberg and Lucas, Galvan moved for a new trial. Judge Shadur granted the motion but without giving defendants an opportunity to respond. He ruled that the verdict was against the manifest weight of the evidence, reasoning that Lucas had fabricated the tip and that the other officers offered false testimony to support this fabrication. Judge Shadur then recused himself, and the case was reassigned to Judge Chang. Defendants moved to reconsider the new trial order. Judge Chang granted their motion and reinstated the verdict.

We conclude that Judge Chang did not abuse his discretion by reconsidering the new trial grant, a non-final order, and determining that the jury's verdict was not against the manifest weight of the evidence. There was no direct evidence contradicting Lucas's testimony about the tip, there was other evidence to support this testimony, and the jury was able to weigh the inconsistencies and make credibility determinations. We therefore affirm the district court's reinstatement of the verdict in favor of defendants.

## I. Background

### A. Factual Background

Officer Lucas claims that he was standing near the front desk in the police station on December 30, 2002 when he answered a phone call. The caller asked whether any "narcs" were working, referring to police officers in civilian dress and unmarked cars. After Lucas told the

caller that no narcs were available, the caller asked whether a "blue belly," meaning a general police officer, was available. Lucas identified himself as one, and the caller responded that he had information about the transportation of approximately 200 pounds of marijuana.

When describing the tip at trial, Lucas testified that the informant had stated that "two dudes" would be driving in a "tricked out" and "shiny clean" black pickup truck. The truck would be traveling south on Pulaski Avenue in the vicinity of Irving Park Road during the "time frame of 4 or 5 o'clock in the evening until 6 o'clock or thereabouts." At trial, Lucas could not remember whether the informant had told him the race or nationality of the truck's occupants, although Lucas had testified in a March 2005 deposition that the informant had said that the men were Hispanic. Lucas testified at trial that the informant had told him that the occupants' ages were "between 25 and 30, 25 or 35, something like that," though he had testified in his deposition that "[the caller] told me 25 or 30." Norberg, Lucas's partner, testified at trial that Lucas had told him that there would be two Hispanic males between the ages of 25 and 30 in the pickup truck, although Norberg had previously testified in a deposition that there would be "one to two" men. In his deposition, Norberg stated that he did not know the caller's gender, but at trial he stated that Lucas had told him that the caller was male. Norberg admitted that he testified that the caller was male because Lucas had told him this detail during the week before the trial.

After receiving the tip, Lucas attended roll call at the police station. Lucas told Norberg about the tip, but he could not recall whether he had also told Lieutenant Joseph Porebski, that evening's watch commander. Porebski stated in a signed but undated affidavit that Lucas had approached him with the anonymous tip—that "a black shiny clean trick line pickup truck occupied by two Hispanic males would be traveling southbound on Pulaski near Irving Park Road between 4 p.m. and . . . 6 p.m. [and] this pickup truck will be transporting hundreds [of] pounds of marijuana." At trial, Porebski testified that he remembered being told that "there would be a large movement of marijuana . . . in a truck," as well as other details that he could no longer remember. He remembered thinking that the tip was "fairly good" and worth following up on.

After roll call, Lucas and Norberg began their patrol and set up a moving surveillance. Lucas and Norberg stopped a truck matching the tip's description around 5:30 p.m. According to Norberg's trial testimony, the pickup made an "evasive move from the left lane to the curb lane and also [did] not us[e] his turn signals." Lucas similarly testified that the pickup "dart[ed] to the far right lane quickly." Norberg testified that he stopped the truck partially because of this traffic offense and partially because it matched the informant's description. Lucas agreed that the maneuver constituted a traffic offense but believed that they had stopped the truck solely because it matched the description.

Norberg approached the driver's side of the truck, and Lucas approached the passenger's side. Norberg told

Manuel Galvan, who had been driving, that he had been stopped for a traffic violation. Norberg testified at trial that he smelled burnt marijuana through the open window, though he did not mention this observation in his earlier deposition or in the case report. Lucas testified that he saw a small bag that looked like a bag of marijuana fly through the air from the driver's side to the passenger's side, landing on the floor of the pickup. Norberg testified that he saw Galvan throw two bags over to the passenger's side. Both officers testified that they then saw the passenger, later identified as Juan Luna, kick two bags against the passenger's side door. The case report, however, stated that Galvan threw the bags to the floor and then Luna kicked the bags over to the driver's side. Both officers asserted that the report's statement was incorrect as to the direction of Luna's kick. At trial, Galvan denied throwing the drugs, but he did not deny that the bags were in the truck or that they belonged to him.

The officers removed both men from the truck and searched it. Lucas testified that they searched the truck because they planned to tow it (pursuant to a police provision requiring the towing of a vehicle believed to contain marijuana), and police procedure requires a search prior to towing. Norberg testified to this reason and added they also searched the pickup because it matched the tip's description. The officers found two bales of plant material wrapped in plastic in the truck bed. Because one of the bags was ripped open, the officers could see the material. Lucas told Norberg, "I think this is reefer." Lucas also burned and smelled the

material, leading him to conclude that the bales were cannabis (as the tip had predicted). Luna and Galvan insisted that the bales were hay from a recent nativity play at St. Wenceslaus Church. The officers nevertheless arrested Galvan and Luna for being in possession of marijuana in the amount of approximately $661,000.

The officers brought the vehicle and the suspected cannabis to the police station. Lucas burned a sample from one of the bales for Lieutenant Porebski and Sergeant Lawrence Casey. At trial, Casey testified that he did not remember whether the bales looked like marijuana, although he had stated in his 2005 deposition that "if I had to guess, I would say . . . it looked more like hay than a bale of marijuana." Casey could not remember whether the burnt sample smelled like hay or marijuana. Porebski testified that he was initially unsure that the bales were marijuana, but he became convinced that they were after consulting a drug reference book and smelling an unlit sample.

Galvan was charged with possession of 100,000 grams of marijuana. Lucas completed the case report that evening. The report referenced the anonymous tip, stating that "Caller told the [officer] that a black pickup truck . . . would be in the vicinity of Irving and Pulaski, and that inside the truck would be approximately 200 [pounds] of cannabis." At trial, Lucas characterized the report as "a summary," admitting that it did not include other details about the tip.

Seven gray bins containing the plant material and baling twine found in the truck bed were sent to the

Illinois State Police Crime Laboratory. Test results revealed that these samples were not marijuana. The results were laid out in a report dated January 2, 2003, which was allegedly faxed to the attention of Officer Norberg on January 3.[1] Lucas and Norberg have denied ever receiving this report. Because Galvan could not post bond and the officers were not aware of the negative lab results for the bales, Galvan remained in custody. While preparing for a preliminary hearing, the Office of the State's Attorney received the negative test results. On January 21, the Office filed a writ to bring Galvan from jail and moved to dismiss the criminal charges. On January 23, the motion was granted, and Galvan was released from custody.

## B. Procedural Background

Galvan filed a § 1983 action against Officer Norberg, Officer Lucas, Officer Jorge Rivera, Cook County Sheriff Michael Sheahan, and the City of Chicago, alleging federal claims of false arrest and imprisonment, malicious prosecution, and failure to supervise, direct, and discipline; and state law claims of malicious prosecution, intentional infliction of emotional distress, and indemnity. Galvan subsequently agreed to dismiss Sheahan and the City of Chicago as defendants, and the district court dismissed the claims against Rivera.

---

[1] The laboratory also determined that the two small bags were indeed marijuana and indicated this in a report dated January 14, 2003.

The case against Norberg and Lucas went to trial, which was presided over by Judge Shadur. The jury was asked to consider whether Officers Norberg and Lucas stopped the pickup truck without reasonable suspicion and whether they arrested Galvan without probable cause. After deliberating for less than a day, the jury returned a verdict for defendants Norberg and Lucas as to both claims.

### 1. The Granting of a New Trial

On August 20, 2009, Galvan moved for judgment as a matter of law and alternatively for a new trial. Defendants were not given an opportunity to provide a written response to this motion. On September 2, 2009, Judge Shadur held a hearing and indicated that he would "probably want to hear from" defense counsel. Judge Shadur did not ultimately give either party the opportunity to respond before he denied the motion for judgment as a matter of law and granted the motion for a new trial. He focused on the impeachment of Lucas, Norberg, and Porebski, and the fact that the case report did not contain many of the details that the officers later testified to:

> I almost without exception rely on the ability of jurors to get things right. I am sorry to say that what I saw and heard in this case represented the most distressing falsehoods coming from the mouths of some members of the Chicago Police Department, a force for which I have always had respect and I have always sought to credit, because I believe so strongly in law enforcement.

Allen [sic] Lucas' testimony was I believe patently false and indeed perjurious. His account of the so-called "anonymous tip" was nothing more as I heard it than a total arrest fabrication. And the rest of his story spring boarded [from] that basic lie.

Just as distressing I will say, was also the closing of ranks by other members of the Chicago Police Department in an effort to buttress that fabrication on his part.

. . .

Just look at the Lucas story. If it's to be believed there was someone out there familiar with gang lingo and familiar with drugs from the way that he spoke, [and] he knew that a pickup truck of a particularly distinctive appearance—the shiny, clean, tricked up or tricked out[,] special paint, black, all of these particulars, was going to be driving in a specific direction north to south on Pulaski Road in that afternoon, occupied by two males, sometimes described as just two males, sometimes as Hispanic males, depending on when Lucas testified at his[] deposition or during the trial. And that truck was going to be carrying a large quantity of marijuana.

Look what happened: A miracle happened. A miracle happened. . . . Now why do I say a miracle? Just exactly that kind of truck fitting that particularize[d] description to a tee . . . and occupied by two males was driving down that very street in that very direction during the specified time frame. And that second truck was carrying a large quantity of hay. Mirabile

dictu. You know, to say that crediting such a patently bogus after the fact horror story is contrary to the manifest weight of the evidence is frankly a major understatement. It's sad to say that. But Lucas I think demonstrated himself to have no respect for the truth. . . .

As for the story of the two bags of user marijuana, if that stood alone it might be said that a fact-finding body, a jury, might reasonably buy either side's argument about credibility. But you see it doesn't stand alone. It has to be looked at in light of the fake description that Lucas gave. And regrettably that was . . . coupled with the big, big lie about the purported justification for the stop. Where officers are so demonstrably untrustworthy on the big picture, the strong inference is that the two bags of marijuana would also be a cover story, if I can make a bad pun "a plant" to sanitize the officer's grossly illegal, indeed unconstitutional conduct.

At the end of the hearing, Judge Shadur recused himself.

### 2. The Reinstatement of the Jury's Verdict

Defendants filed a motion to reconsider with Judge Hart, the newly assigned judge. The case was then reassigned to Judge Chang, who solicited supplemental briefs. On May 18, 2011, Judge Chang granted defendants' motion and reinstated the jury's verdict.

Judge Chang began his analysis by addressing the propriety of his reconsideration of the new trial decision. Judge Chang stated that non-final orders can be revised

at any time before the entry of a final judgment, though he also noted case law cautioning judges to revise decisions only in extraordinary circumstances. Judge Chang determined that the "law of the case" doctrine operated with less force because defendants had not been given an opportunity to respond to plaintiff's motion for a new trial. Judge Chang further concluded that he had "a freer hand" to reconsider, since Judge Shadur "did *not* rely on first-hand observations of the witnesses' demeanor, body language, or tone of voice."

Judge Chang agreed with defendants that the jury's verdict was not against the manifest weight of the trial evidence.[2] He pointed out that there was no direct evidence contradicting Lucas's testimony about the details of the tip or his receipt of the tip. Judge Chang determined that Judge Shadur's ruling was based on his "common-sense notion that the tip was too good to be true" rather than on "actual evidence, let alone a *manifest* weight of evidence, that required the jury to reject the testimony that Lucas had received the tip." Judge Chang identified specific facts indicating that the tip was not too good to be true, namely that the tip was inaccurate as to the occupants' ages and that the information

---

[2] Judge Chang rejected defendants' broader argument that a judge lacks the authority to discredit a witness's testimony on a new trial motion unless the testimony is indisputable. Judge Chang explained that the trial judge cannot remove evidence from consideration unless no reasonable jury could believe it, but that the trial judge retains the authority to find testimony not credible in light of the manifest weight of the evidence.

could have been provided by "[a]ny person familiar with Luna's or Galvan's work schedule and with Luna's truck." Judge Chang also determined that the testimony from Lucas, Norberg, and Porebski provided sufficient evidence for the jury to find that Lucas had actually received the tip. Judge Chang pointed out that the reference to the tip in the case report meant that Lucas would have had to start laying the foundation for the cover-up even before the lab report indicated that the bales were not marijuana. Judge Chang noted how quickly this fabrication would have had to occur and the level of cooperation needed from Norberg and Porebski. Judge Chang pointed to evidence other than the tip, including the traffic offense and the two bags of suspected marijuana, that could support a finding of probable cause. Finally, Judge Chang rejected Galvan's argument that the verdict was against the manifest weight of the evidence because the officers' testimony was conflicting and inconsistent. Judge Chang emphasized that the jury heard the evidence and made its credibility determinations.

Galvan appeals Judge Chang's reinstatement of the jury's verdict and urges us to reinstate Judge Shadur's grant of a new trial.

## II. Discussion

### A. The Decision to Reconsider Plaintiff's Motion for a New Trial

The grant of a new trial (in civil cases) is a non-final, non-appealable order. *See Allied Chem. Corp. v. Daiflon, Inc.*,

449 U.S. 33, 34 (1980); *Latino v. Kaizer*, 58 F.3d 310, 314
(7th Cir. 1995). Federal Rule of Civil Procedure 54(b)
provides that non-final orders "may be revised at any
time before the entry of a judgment adjudicating all
the claims and all the parties' rights and liabilities." FED.
R. CIV. P. 54(b); *see also Marconi Wireless Tel. Co. v.
United States*, 320 U.S. 1, 47 (1943). Because the grant of
a new trial is an interlocutory order and thus subject
to revision by the district court, the district court has
the discretionary authority to reconsider a new trial order.
*See Gallimore v. Mo. Pac. R.R. Co.*, 635 F.2d 1165, 1170-
72 (5th Cir. 1981); *see also Peterson v. Lindner*, 765 F.2d 698,
704 (7th Cir. 1985) (stating that a judge has the power
to reconsider an interlocutory order at any time before
final judgment). Here, Judge Chang did not err by
deciding to reconsider the new trial order.[3] He properly
relied on the order's interlocutory status as giving
him the authority to reconsider and revise it.

Judge Chang also stated that, under the "law of the case"
doctrine, judges should refrain from reopening issues
decided in earlier stages of the case absent extraordinary

---

[3] Although we refer to the motion before Judge Chang as a
motion to reconsider, the motion is not a traditional Rule 59(e)
motion to reconsider, which can only follow a "judgment."
Judge Shadur's grant of a new trial had the effect of vacating the
judgment that normally follows the jury's verdict. Rule 54(b)
governs non-final orders and permits revision at any time
prior to the entry of judgment, thereby bestowing sweeping
authority upon the district court to reconsider a new
trial motion.

circumstances. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008). We have recognized, however, that the law of the case doctrine is discretionary and does not preclude a district court from reopening a decided issue. *See Harris*, 531 F.3d at 513; *see also Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995) (referring to the doctrine as "no more than a presumption, one whose strength varies with the circumstances").[4] We nevertheless advise judges that, because litigants have a right to expect consistency even if judges change, the second judge should "abide by the rulings of the first judge unless some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) (noting that the law of the case doctrine is less controlling when the disputed issue is not presented in "precisely the same way" to the later judge).

Judge Chang correctly determined that the law of the case doctrine applies with less force in this case since the prior order was interlocutory and since a "new develop-

---

[4] Based on the interlocutory nature of an order granting a new trial, some courts have ruled that the law of the case doctrine has no force at all in this context. *See, e.g., Langevine v. District of Columbia*, 106 F.3d 1018, 1022 (D.C. Cir. 1997); *Day v. Amax, Inc.*, 701 F.2d 1258, 1263 (8th Cir. 1983). *But see United States v. O'Keefe*, 128 F.3d 885, 891 (5th Cir. 1997) (applying the doctrine to a grant of a new trial).

ment" occurred: defendants had not been given the opportunity to respond to the initial new trial ruling and thus Judge Chang was confronted with the first adversarial presentation of the new trial issue. Additionally, although Judge Chang did not preside over the trial, he was well equipped to reconsider the new trial grant. Judge Chang aptly recognized that he had a "freer hand" in reconsidering the ruling because Judge Shadur "did *not* rely on first-hand observations of the witnesses' demeanor, body language, or tone of voice." Judge Shadur relied on his common-sense notion of the case (i.e., that the tip was too good to be true), rather than on any in-court observations. Thus, Judge Chang possessed both the authority and the ability to reconsider the new trial order.

Because we conclude that Judge Chang properly exercised his discretion in deciding to reconsider the grant of the new trial, we now must consider whether Judge Chang acted within his discretion in reinstating the jury's verdict in favor of defendants.

## B. The Decision to Reinstate the Jury's Verdict

The ruling on a motion for a new trial is a matter committed to the district court's discretion, *see Latino*, 58 F.3d at 314, and we review a district court's ruling on a motion for a new trial for abuse of discretion, *see Davis v. Wis. Dep't of Corrs.*, 445 F.3d 971, 979 (7th Cir. 2006). Our review of a decision denying a new trial is "extremely deferential," as opposed to our "somewhat more exacting" review of a decision granting a new trial.

*See In re Innovative Constr. Sys.*, 793 F.2d 875, 888 (7th Cir. 1986). We review the evidence in the light most favorable to the verdict. *See Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 444-45 (7th Cir. 2009). Judge Shadur granted the new trial based on his conclusion that the verdict was against the manifest weight of the evidence; Judge Chang then reconsidered this ruling and reinstated the jury's verdict. We review Judge Chang's decision to determine whether he abused his discretion in concluding that no new trial was warranted because the verdict was not actually against the manifest weight of the evidence.

We have recognized that "[if], after evaluating the evidence, the district court is of the opinion that the verdict is against the manifest weight of the evidence, a new trial is appropriate." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011). Although "the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial," *id.* at 633, we have cautioned that "[t]he district court's power to grant a new trial on weight grounds is not unlimited: a certain deference to the jury's conclusions is appropriate," *id.* at 633 n.1. The district court also has less freedom to overturn a jury verdict in cases involving issues that are easily understood by laypeople. *See Latino*, 58 F.3d at 314. We recently clarified the standard for a district court's assessment of a motion for a new trial:

> In conducting its own assessment of the evidence
> presented, the district court cannot remove a piece

of evidence from the calculus merely because the court believes it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight. *Latino v. Kaizer*, 58 F.3d 310, 315-17 (7th Cir. 1995). In weighing the facts, the district court is bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing process only if "reasonable persons could not believe" it because it "contradicts indisputable physical facts or laws." *Id.* at 315. Put simply, if the evidence was admitted before the jury, the district court is usually stuck with it in ruling on a motion for a new trial, for better or worse.

*Mejia*, 650 F.3d at 633-34. We have similarly expressed that the party moving for a new trial "must demonstrate that no rational jury could have rendered a verdict against [him]." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2004); *see also Latino*, 58 F.3d at 315 ("[N]ew trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.").

Judge Chang provided a detailed explanation as to why the jury's verdict was not against the manifest weight of the evidence. He emphasized that "there was no direct evidence" contradicting Lucas's testimony about receiving a tip or about the tip's details. Judge Chang criticized Judge Shadur's opinion for

"rel[ying] on what it viewed as the common-sense notion that the tip was too good to be true. But there was no actual evidence, let alone a *manifest* weight of evidence, that required the jury to reject the testimony that Lucas had received the tip." Judge Chang concluded that the combination of Lucas's, Norberg's, and Porebski's testimony supplied sufficient evidence for the jury to find that Lucas had actually received the anonymous tip. Judge Chang also found the case report to serve as additional evidence in support of the verdict. He further pointed out that if the tip was an "after-the-fact cover-up," Lucas would have had to start laying the groundwork before the lab reports came back negative and would have had just two hours between the arrest and the report to fabricate the story. Judge Shadur's perception of the anonymous tip is understandable, given the conflicting testimony and the lack of details in the case report; however, the standard for granting a new trial requires the jury's verdict to be against the manifest weight of the evidence. *See Mejia*, 650 F.3d at 633. We agree with Judge Chang's assessment that sufficient evidence was presented to the jury to support its verdict.

We also agree with Judge Chang's view that the tip was not necessarily too good to be true. He pointed to the discrepancy about the occupants' ages as illustrating that the tip was not perfect. Judge Chang stated that the jury could have plausibly concluded that "the tipster in fact was someone with some familiarity with Galvan or Luna" or that "there was indeed a tipster who saw another truck matching the same details, and that Galvan was in the wrong place at the wrong time." Accord-

ing to Judge Chang, a person familiar with the truck and with Luna or Galvan's work schedule would have been able to provide all of the information in the tip. The hay sat in the truck for four days, allowing ample time for someone to observe it, and anyone who had seen the truck would have been able to describe it to police. The tip could have been provided by someone who mistook the hay for marijuana or by someone who knew that it was hay but wanted Luna or Galvan arrested. Thus, Judge Chang properly concluded that the jury's verdict rests on plausible theories of the evidence presented.

Judge Chang acknowledged that portions of the testimony were inconsistent or conflicting, but he reasoned that "[t]he jury heard all of the conflicting and inconsistent testimony, bad memories and impeachment and all, and then did precisely what it is called upon to do, which is make a credibility determination that was not manifestly outweighed by other evidence." Judge Chang further explained that the jury could have attributed the inconsistencies to "the passage of time and the fading of memories." Judge Chang did not abuse his discretion by deferring to the jury's credibility determinations. The jury weighed the evidence, including the conflicting testimony, and arrived at a verdict that is supported by the evidence—or at least a verdict that is not against the manifest weight of the evidence.

Our task is not to determine whether Officer Lucas fabricated the anonymous tip but rather to determine whether Judge Chang abused his discretion in

concluding that the jury's verdict was not contrary to the manifest weight of the evidence.[5] In this case, regardless of whether the district court believed that the jury arrived at the correct outcome, there was no direct evidence contradicting Lucas's testimony about the details of the tip or the fact that he received it. It was well within the province of the jury to decide whether the inconsistencies called into question the existence of the tip. The case report, Norberg's testimony, and Porebski's testimony all support Lucas's testimony and the jury's verdict. Judge Shadur's theory that Lucas fabricated the tip and obtained the cooperation of other officers is plausible, but the theory that defendants presented (and the jury accepted) is also plausible. We therefore hold that Judge Chang did not abuse his discretion by concluding that the verdict was not against the manifest weight of the evidence and reinstating the jury's verdict.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's decision to reconsider the motion for a new trial and reinstate the jury's verdict.

---

[5] By requiring adherence to the manifest weight standard, we ensure that the district court gives the appropriate level of deference to the jury's determinations. *See Mejia*, 650 F.3d at 633 n.1.

---