In the

# United States Court of Appeals
### For the Seventh Circuit

No. 11-2225

SARAH WHITEHEAD,

*Plaintiff-Appellant,*

*v.*

LAWRENCE J. BOND, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 3765—**Ruben Castillo**, *Judge.*

ARGUED MARCH 27, 2012—DECIDED MAY 21, 2012

Before FLAUM, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Plaintiff Sarah Whitehead brought this suit under 42 U.S.C. § 1983 against Chicago police officers Thomas Stack, Michael Stevens, and Lawrence Bond (and others who are not parties to this appeal) alleging Fourth Amendment claims of false arrest and excessive force (and other claims not at issue). The events giving rise to Whitehead's arrest began when Officer Bond and his partner Officer Kevin Geyer

stopped Whitehead's adult son, Daniel, for a traffic viola-
tion. After the officers found crack cocaine in the car,
Daniel attempted to flee, resulting in a physical alterca-
tion between him and the officers. Whitehead, who lived
close, was told by a neighbor, "you have to get down
to the corner," "they're killing your son." Whitehead
hurried to the scene; what occurred next is hotly contested.

Whitehead claims she was calmly asking about her son
when she was accosted by Officer Bond and arrested
by Lt. Stevens for no apparent reason. Sgt. Stack and Lt.
Stevens testified that Whitehead was yelling, being ag-
gressive, and leading the crowd that had gathered in
a charge toward Officer Bond, so they arrested her
and placed her in the prisoner wagon for five to ten
minutes before releasing her. Officer Bond testified that
he never saw Whitehead, Sgt. Stack, or Lt. Stevens at the
scene and left almost immediately after placing Daniel
in the squad car. Sgt. Stack testified that he and Officer
Bond spoke briefly after Whitehead was placed in the
prisoner wagon.

Before trial, Whitehead moved to exclude evidence
of events that preceded her arrival and testimony that
the events took place in a "high-crime area." The
district court denied the motion. After a four-day trial,
the jury returned a verdict in favor of the defendants.
Whitehead moved for judgment as a matter of law on
the false arrest claim, arguing that the officers' testimony
was inherently incredible and physically impossible.
In the alternative, she sought a new trial on the basis
that the verdict was against the manifest weight of the

evidence and the district court erroneously admitted unduly prejudicial evidence in violation of Rule 403 of the Federal Rules of Evidence. The district court denied her motions. Because we find that this case boils down to a credibility contest that was properly reserved for resolution by the jury and because we do not find reversible error in the district court's balancing of the probative value and prejudicial effect of the challenged evidence, we affirm.

## I. Facts

On June 20, 2008, around 4:25 p.m., Chicago police officers Bond and Geyer pulled over Daniel, the plaintiff's adult son, at the 800 block of South Lavergne Street near West Polk Street in Chicago because the vehicle he was driving had no license plates. Daniel didn't have a driver's license or proof of insurance, so the officers handcuffed him and placed him in the squad car. The officers also placed his passenger, James Jones, in the squad car. The officers searched Daniel's car and found baggies of crack cocaine. When the officers opened the door of the squad car, Jones pushed his way out and ran. Daniel, according to the officers' testimony, made a similar attempt to flee and, when the officers tried to stop him, a struggle ensued, during which Daniel kicked Officer Bond in the chest, knocking him to the ground. Jones got away, but the officers were able to subdue Daniel. Whitehead presented eyewitness testimony from neighbor James Finkley that the officers beat Daniel until he shook badly and stopped moving. Officers Geyer and Bond testified otherwise.

A crowd had started gathering from both ends of the block. While Officer Geyer had Daniel on the ground, Officer Bond informed dispatch of the situation and requested backup officers. Although the testimony at trial was conflicting, anywhere from four to twenty people had gathered. According to the officers, the crowd, which was rowdy and yelling at them, was led by Marcus Mynatt. As the crowd drew closer, the officers ordered them to stay back, but Mynatt didn't comply.

The dispatcher heard the commotion at the scene and declared a "10-1," which means an officer needs immediate emergency help; it is the highest-level alert and requests the immediate presence of officers from inside and outside the district. Within seconds, Officer Geyer informed the dispatcher that it was not a 10-1 and said "everything was under control." But even when a 10-1 is called off officers within the district generally come to investigate. Approximately nine police cars (sixteen to eighteen police officers) were at the scene within minutes of the call.

Officers Sweeney and Belcher were the first backup officers to arrive. Officer Sweeney testified that there were ten or fewer people in the crowd. At the time, Officers Bond and Geyer were trying to detain Daniel and they yelled for Officers Sweeney and Belcher to grab Mynatt; upon hearing this, Mynatt ran. Officers Sweeney and Belcher chased him, quickly apprehended him, and secured him in a squad car. More police cars started arriving. Officer Bond testified that although people in the crowd were still yelling, he was less concerned with

them because the assisting officers could handle the situation; he turned his attention to Daniel.

Before Officer Bond left with Daniel, a neighbor ran and told Whitehead, who lived a few blocks down the street, "You have to get down to the corner," "they're killing your son," without identifying who "they" were. Whitehead, followed by her husband Donald, left the house immediately and headed to the scene. Donald testified that he saw ten to twenty private citizens out on the street when they arrived. What happened after their arrival is disputed and is the centerpiece of the trial controversy.

Lt. Stevens and Sgt. Stack arrived on the scene shortly after the 10-1 call. Lt. Stevens testified that when he arrived it was a "chaotic situation" and that there was a crowd of ten to fifteen people in an alley on Lavergne and another crowd on the corner of Polk. Lt. Stevens heard people in the crowd yell "fuck the police." Sgt. Stack testified that he saw a group of ten to twenty people on Lavergne and that the crowd was yelling and appeared hostile. Both officers testified that Officer Bond was still on the scene standing outside his squad car when they arrived.

According to the officers, Whitehead was at the front of the crowd, flailing her arms, screaming, yelling, swearing, and completely out of control. Whitehead was moving toward Officer Bond's squad car as people in the crowd were trying to hold her back. Lt. Stevens was concerned that Whitehead might try to let the offender out, attack the officers, or had a psychiatric illness.

Lt. Stevens ordered the crowd to step back and calm down, but Whitehead refused to comply. According to Sgt. Stack, Whitehead was twenty to thirty feet from Officer Bond. She continued to scream, broke free from the crowd, and began crossing the street toward Officer Bond. Lt. Stevens stepped between Whitehead and Officer Bond's car and ordered Whitehead and the crowd to step back, but she kept advancing. It was around this time (at 4:32 p.m.—only a couple minutes after the first backup officers arrived), that Officer Marisol Randonis showed up on the scene with the prisoner wagon. When she arrived she saw Lt. Stevens standing on the sidewalk talking to Whitehead; she testified that they (Lt. Stevens and Whitehead) were about twenty to thirty feet apart. She heard Whitehead screaming and yelling loudly in an angry tone, loud enough to be heard a football-field length away. She testified that Whitehead was belligerent and was moving her hands aggressively. Other officers were trying to disperse the crowds and she saw a crowd of ten to fifteen people dispersing.

Lt. Stevens testified that he grabbed Whitehead, handcuffed her (or had someone handcuff her), and, with the assistance of Sgt. Stack, walked her to the prisoner wagon. Lt. Stevens and Sgt. Stack testified that Officer Bond was about ten feet away when Whitehead was handcuffed; neither officer saw Whitehead interact with Officer Bond or knew whether Officer Bond saw Whitehead. Lt. Stevens testified that these events happened within twenty to thirty seconds after his arrival, that "[i]t all happened very quickly," and was a "very fluid, quick

situation." Whitehead was detained for obstructing a peace officer, reckless conduct, disorderly conduct, and mob action.

Officers Bond and Geyer testified that they left almost immediately after securing Daniel in the squad car. According to Officer Geyer, they were on the scene less than fifteen minutes. Both officers testified that they did not see Sgt. Stack, Lt. Stevens, Whitehead, or a prisoner wagon at the scene. Officer Bond said he couldn't say whether he was on the scene when Whitehead was there. Sgt. Stack, however, testified that after placing Whitehead in the prisoner wagon, he went over and spoke to Officer Bond for a minute or minute and a half about what happened, whether he was hurt, whether the offender was hurt, and whether anyone needed medical attention.

Whitehead's account of what took place that day is much different. She testified that she encountered a calm scene and that Lt. Stevens was talking to the crowd and laughing. She saw Officer Bond standing outside a police car, approached him, informed him who she was, and asked about her son. Whitehead, her husband Donald, and eyewitness Finkley testified that Officer Bond exploded, and said, "He's a fucking idiot." According to Whitehead and Donald, Officer Bond ordered her to step back on the curb, pushing her, kicking her heels, and belly-bumping her along the way. Officer Bond was swearing and acting like he was going to hit Whitehead even though she was fully cooperating and calm. (Finkley testified that he didn't see Officer Bond push, kick, belly-

bump, or physically touch Whitehead. He was distracted by an officer telling him to get back and the next time he directed his attention to Whitehead, she was interacting with Lt. Stevens.)

At that point, according to Whitehead, Lt. Stevens intervened, trying to hold Officer Bond back, but Bond kept trying to get around Lt. Stevens to attack Whitehead. Donald told Whitehead to come toward him and Lt. Stevens said, "Go ahead, Bitch. Keep walking." Whitehead told Lt. Stevens she could expect this language from the officer, but not from him (a lieutenant). Lt. Stevens ordered her not to speak and she responded, "I won't," and then Lt. Stevens said "That's it. You're under arrest." Lt. Stevens grabbed her, had her handcuffed, and requested Officer Randonis to place her in the prisoner wagon. (Officer Randonis testified that Whitehead violently resisted being put in the prisoner wagon, but Lt. Stevens and Sgt. Stack both testified that Whitehead did not resist arrest.)

There is conflicting testimony as to how long Whitehead was in the wagon. The jury heard the following time estimates from the following witnesses: Lt. Stevens, 2-10 minutes; Sgt. Stack, 2-5 minutes; Randonis, 10 minutes; Whitehead, 20 minutes; and Finkley, 10 minutes. Lt. Stevens testified that Donald came up to him and said, "I'm her husband. She's acting crazy. Please let her go. I'll take care of her." He informed Lt. Stevens that Whitehead was the offender's mother. Lt. Stevens released Whitehead because she had calmed down. She was not charged with a crime. Lt. Stevens testified that he was on the scene for a total of five to ten minutes.

Numerous other officers testified at trial that when they arrived the crowd was not acting unruly and that Officers Bond and Geyer were still on the scene. They testified that they either didn't see Whitehead or that she was already in the prisoner wagon. At least one officer didn't recall seeing Lt. Stevens, Sgt. Stack, or the prisoner wagon at the scene.

## II. Analysis

Whitehead raises three issues on appeal. First she asserts that the district court erred in failing to grant her motion for judgment as a matter of law because the officers' testimony was exceedingly improbable and physically impossible. Next she contends that even if the officers' testimony is not excluded on those grounds, the district court should have granted her a new trial because the verdict was against the manifest weight of the evidence. She also argues that she is entitled to a new trial because the district court abused its discretion in balancing evidence under Rule 403. We address each argument in turn.

### A. Motion for Judgment as a Matter of Law

We review the district court's denial of the motion for judgment as a matter of law de novo, taking "the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party

against whom the motion is directed." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (quotations omitted). Rule 50(a) of the Federal Rules of Civil Procedure allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial but only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Because the defendants prevailed at trial, we construe the facts strictly in their favor. *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). "In cases involving simple issues but highly disputed facts (an apt description of this case), greater deference should be afforded the jury's verdict." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995) (parenthetical in original).

The trial in this case, simply stated, was a credibility contest. "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Schandelmeier-Bartels*, 634 F.3d at 376. A district court can disregard testimony only if "reasonable persons could not believe" it because it "contradicts indisputable physical facts or laws." *Latino*, 58 F.3d at 315; *see also Mejia v. Cook Cnty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011); *Burger v. Int'l Union of Elevator Constructors Local No. 2*, 498 F.3d 750, 753 (7th Cir. 2007) (the objective evidence must show that it would be unreasonable to believe a critical witness for one side). Evidence is incredible as a matter of law only when it would have been "physically impossible for the witness to observe that which he claims occurred, or impossible

under the laws of nature for the occurrence to have taken place at all.*" United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (quotations omitted); *see also United States v. Cervante*, 958 F.2d 175, 180 (7th Cir. 1992) (stating that we will not disturb credibility determinations unless the testimony is "exceedingly improbable"). "Discrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive do not render witness testimony legally incredible." *United States v. McEntire*, 153 F.3d 424, 435 (7th Cir. 1998).

Whitehead contends that in ruling on her motion for judgment as a matter of law, the district court should have disregarded the officers' testimony as inherently incredible. She explains that Officers Bond and Geyer testified that they didn't see Lt. Stevens, Sgt. Stack, or Whitehead on the scene and left almost immediately after placing Daniel in the squad car. According to Lt. Stevens and Sgt. Stevens, though, Whitehead, standing ten feet from Officer Bond, was acting aggressively, yelling, and charging toward him. Sgt. Stack also testified that he spoke to Officer Bond for about a minute and a half after placing Whitehead in the prisoner wagon.

There can be no doubt that there were inconsistencies between Lt. Stevens' and Sgt. Stack's testimony and Officers Bond's and Geyer's testimony. Such inconsistencies, however, are not enough to find the testimony incredible as a matter of law. For instance, the jury was free to disregard Officer Bond's testimony and instead credit Lt. Stevens' and Sgt. Stack's version of the events. *See United States v. Colston*, 936 F.2d 312, 315 (7th Cir.

1991) ("Generally, juries may reject parts of a witness's testimony while accepting other parties."); *see also Kraushaar v. Flanigan*, 45 F.3d 1040, 1054 (7th Cir. 1995). Lt. Stevens' and Sgt. Stack's testimony was not internally inconsistent and was corroborated in most respects by Officer Randonis.

Although other officers testified that they did not observe Whitehead or an unruly crowd when they arrived, the record is unclear when each officer arrived and where they were in relation to the crowd. The situation with Whitehead was resolved within twenty to thirty seconds, quite possibly before the other officers arrived. Also, the officers were testifying to events that took place two and a half years earlier and there were numerous distractions at the scene, which spanned a block. The officers' perspectives reasonably varied depending on the exact time of their arrival, where they were (squad cars were parked all along the block), and where they focused their attention (there were nine police cars on the scene, approximately eighteen police officers, and two crowds—one in an alley on Lavergne and another on the corner of Polk).

It would have also been reasonable for the jury to believe Officer Bond's testimony that he was not focused on the crowd and was instead preoccupied with the events that had just transpired and had turned his attention to Daniel. Minutes before, Daniel had kicked Officer Bond in the chest and knocked him to the ground. While Officers Bond and Geyer tried to subdue Daniel, a crowd started yelling at and approaching them. Officer

Bond faced a chaotic, tense, and rapidly unfolding situation. When Whitehead arrived, the crowds (located in two places) were still unruly and loud and there were police cars and officers all along the block. Officer Bond testified that he was initially concerned with the crowd, but when assisting officers showed up, he focused his attention on Daniel. Although Daniel was secured in the squad car, Officer Bond was responsible for transporting him to the station and completing his formal arrest. And James Jones, who had escaped the officers' grasp, was still on the loose, another potentially disconcerting fact.

Given the other distractions on the scene and that Officer Bond's attention was no longer on the crowd, it would have been reasonable for the jury to conclude that Officer Bond didn't notice Whitehead during the twenty to thirty seconds that she was yelling and acting aggressively in moving the crowd toward him. The jury could also reasonably believe that Officer Bond simply forgot the relatively unremarkable one and a half minute conversation with Sgt. Stack.

The verdict demonstrates that the jury chose to credit Lt. Stevens' and Sgt. Stack's testimony over Whitehead's, Donald's, and Finkley's. This was not unreasonable, particularly considering that the jury could have found Whitehead's version of the events unbelievable. Whitehead testified that she approached the scene calmly even though she was just told by a neighbor that "they're killing your son." Further, she testified that Lt. Stevens attempted to get between her and Officer Bond to prevent

an altercation, but then Lt. Stevens, for no apparent reason, called her a "bitch" and arrested her. There were also certain inconsistencies and, what the jury may have reasonably believed were, exaggerations in the plaintiff's case (which we don't need to discuss) that potentially made her claims less credible. The jury could have concluded that her version of the story simply didn't add up.

In any event, the inconsistencies between the officers' testimony do not lead to the conclusion that Lt. Stevens' and Sgt. Stack's testimony was incredible as a matter of law. The objective evidence does not show that it would be unreasonable to believe Lt. Stevens' or Sgt. Stack's version, nor was their testimony physically impossible. Whitehead repeatedly pointed out the inconsistencies and weaknesses in the officers' testimony to the jurors, and it was within their province to decide whose testimony to credit. *See United States v. Alcantar*, 83 F.3d 185, 189-90 (7th Cir. 1996) (stating that the inconsistencies in the witness's testimony were "fully aired to the jury on cross-examination, but the jury still chose to credit [the witness's] story; [t]hat was a judgment the jury was privileged to make, and [the defendant] has provided us with no basis for disturbing it."). "When a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere, as the jury is the final arbiter on such questions." *Id.* at 189.

Whitehead hasn't argued on appeal that if we accept Lt. Stevens' and Sgt. Stack's testimony that the evidence

is insufficient for the jury to find probable cause for her arrest. Because we find that the jury could consider their testimony, we conclude that the district court properly denied the plaintiff's motion for judgment as a matter of law.

## B. Motion for New Trial

Whitehead raises two grounds in her request for a new trial: (1) the evidence was against the manifest weight of the evidence; and (2) certain evidence admitted by the district court should have been excluded as unduly prejudicial under Rule 403. We review a motion for new trial for abuse of discretion. *See Clarett*, 657 F.3d at 674. "A new trial may be granted if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *Id.* (quotations omitted). A new trial should be granted, however, "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* (quotations omitted).

### 1. Against the Manifest Weight of Evidence

When considering whether the verdict was against the manifest weight of the evidence, "the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633. "In conducting its own assess-

ment of the evidence presented, the district court cannot remove a piece of evidence from the calculus merely because the court believes it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight." *Id.* We have already found that the district court cannot disregard the officers' testimony as physically impossible or inherently incredible, so the district court was bound by the same evidence the jury considered in ruling on the motion for new trial. *See id.* "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (quotations omitted); *see also Galvan v. Norberg*, 2012 WL 1570876, *8 (7th Cir. May 7, 2012).

Whitehead relies heavily on *Mejia* in arguing that the district court applied the wrong standard to her motion for new trial by looking at the case in the light most favorable to the defendants instead of making an independent, neutral decision based on the credibility of the witnesses and evidence. Whitehead's reading of *Mejia*, which places the judge in the role of a 13th juror, is misguided. In *Mejia*, the district court determined that the weight of the evidence (not necessarily the *manifest* weight) was against the defendants, but concluded that it could not set aside the verdict unless the defendants' testimony contradicted indisputable physical facts or laws. 650 F.3d at 633. We held that the "indisputable facts" analysis comes into play only when considering whether to remove evidence from the court's evaluation.

*Id.* at 634. This analysis, we explained, "has no application when the court merely *weighs* the evidence itself." *Id.* (emphasis in original). The district court in that case viewed the evidence in the light most favorable to the defendants (rather than neutrally) and concluded that the verdict could not be set aside unless the evidence supporting it was impossible. *Id.* Because the power to weigh the evidence is not limited by such a standard, we reversed. *Id.*

*Mejia* stands for the proposition that the district court must properly exercise its discretion in weighing the evidence to determine if it's against the *manifest* weight of evidence. The district court, however, cannot grant a new trial just because it believes the jury got it wrong. *See Latino*, 58 F.3d at 315. "[S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Id.* "Even when evidence is contradictory, '[i]t's the jury's job—not the district court's job or the job of a panel of appellate judges—to figure out who's telling the truth.'" *United States v. Hassebrock,* 663 F.3d 906, 920 (7th Cir. 2011) (quoting *Lowe v. Consol. Freightways of Del.*, 177 F.3d 640, 642–43 (7th Cir. 1999) ("The fact that [the defendant] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed. . . . The jury was there; it weighed the witnesses' credibility, considered the evidence, and reached a supportable conclusion.")), *petition for cert. filed*, 80 BNA U.S.L.W. 3480 (2012). "We will not supplant the jury's reasonable and factually supported verdict with our

own judgment." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008).

The district court acknowledged that it was required to weigh the facts when addressing Whitehead's motion for new trial and concluded:

> The jurors . . . were presented with two sharply conflicting portrayals of the events on June 20, 2008, and they were entitled to believe either side. Whitehead testified that she was harassed by Bond and Stevens after calmly inquiring about her son, and then was thrown in the back of a [prisoner wagon] despite complying with all of their orders. Bond testified that he never saw Whitehead at the scene, and Stevens and Stack testified that Whitehead acted disruptively and failed to follow the orders they had issued to control the hostile crowd that had gathered. Given this conflicting testimony, none of which "contracts indisputable physical facts or laws," . . . **the jury had a reasonable basis** to find that the individual Defendants had probable cause to arrest Whitehead and did not use excessive force in doing so.
>
> After **weighing all of the evidence** presented at trial, the Court finds that this is not a case in which "**no rational jury could have rendered the verdict**." . . . Because the verdict was **not against the manifest weight of the evidence**, the Court declines to grant Whitehead a new trial.

(emphasis added). The district judge's discussion of the evidence and comparative strength of the facts wasn't

extensive, but we do not fault him because Whitehead's arguments on this issue were brief and merely referred the court back to her arguments on the inherent incredibility of the officers' testimony. The judge nevertheless, citing *Mejia*, applied the proper standard, understood his role in weighing the evidence, and relying on all the evidence, including the officers' testimony, concluded that the jury had a reasonable basis to find in favor of the defendants. *See Aldridge v. Forest River, Inc.*, 635 F.3d 870, 877 (7th Cir. 2011) ("This court will not overturn a jury verdict if a reasonable basis exists in the record to support it.").

"[O]nce the district court applies the correct law, its discretion is wide and our review deferential." *Mejia*, 650 F.3d at 634; *see also Galvan*, 2012 WL 1570876, *7 ("Our review of a decision denying a new trial is "extremely deferential."). "[T]he district court is in the best position to evaluate the evidence and determine whether the verdict was against the manifest weight; it heard the witnesses testify, saw the evidence presented, and gained a better appreciation of the nuances of the case than could be gleaned from a cold, written record. *Mejia*, 650 F.3d at 634; *see also Aldridge*, 635 F.3d at 876-77 ("The district court, having seen the presentation of the evidence and observed the witnesses, is in a unique position to rule on a new trial motion." (quotations omitted)). Based on this record, we cannot find that the district court, having observed the witnesses testify to their different versions of events and having assessed their credibility, abused its discretion in concluding that the jury verdict was not against the manifest weight of the evidence.

**2. Evidentiary Rulings**

Whitehead contends that the district court erred in not granting her Rule 59 motion for new trial because the evidence admitted at trial was unfairly prejudicial under Rule 403. We afford significant deference to the trial court's decision weighing probative value against prejudice. *Cerabio LLC v. Wright Med. Tech., Inc.,* 410 F.3d 981, 994 (7th Cir. 2005). "We review the district court's evidentiary decisions for abuse of discretion and will reverse only where no reasonable person could take the view adopted by the trial court." *Clarett,* 657 F.3d at 669 (quotations omitted). And even if the district court erred, we will not reverse if the error was harmless. *Id.* "A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Cerabio*, 410 F.3d at 994 (internal citation omitted). "Evidentiary errors satisfy this standard only when a significant chance exists that they affected the outcome of the trial." *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012).

**a. Evidence of Daniel's, Jones's, and Mynatt's conduct**

The district court (over the plaintiff's objection) admitted testimony concerning events that took place before Whitehead's arrival on the scene, but agreed with plaintiff that charges or guilty pleas as to Daniel, Jones, and Mynatt should be excluded. Whitehead alleges that evidence relating to Daniel's, Jones's, and Mynatt's conduct was irrelevant and highly prejudicial because it

created a mini-trial-within-a-trial and was used to elicit sympathy for the police and to impute Daniel's bad behavior to her. In allowing the evidence, the district court explained that the information was relevant to provide context, assess Officer Bond's testimony, and evaluate testimony about the mood of the crowd.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. In making this determination, "[w]e will not substitute [our] opinion for that of the trial judge merely because we may be inclined to rule differently on the question of relevancy." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quotations omitted). Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. Recognizing that "most relevant evidence is, by its very nature, prejudicial, we have emphasized that evidence must be *unfairly* prejudicial to require exclusion." *Boros*, 668 F.3d at 909 (quotations omitted) (emphasis in original). We employ a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice. *Id.* "Evidence is unfairly prejudicial in the context of Rule 403 if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Common v. City of Chicago*, 661 F.3d 940, 947 (7th Cir. 2011) (quotations omitted). "[A] district court, in exercising its discretion under Rule 403, must carefully analyze and assess the prejudicial effect of challenged evidence." *United States v. Loughry*, 660 F.3d 965, 971 (7th Cir. 2011).

Evidence of Daniel's, Jones's, and Mynatt's conduct immediately before Whitehead's arrival was relevant. "[O]ne measure of relevance is whether its exclusion would leave a chronological and conceptual void in the story." *Boros*, 668 F.3d at 908 (quotations omitted). Even where evidence is not directly related to a disputed fact, it may be relevant when it provides background information. *Id*. The testimony explained why Whitehead's neighbor said, "They're killing your son," why Whitehead hurried to the scene and inquired about her son, why approximately eighteen police officers were there, and why a sizeable crowd had gathered. This background information allowed the jury to put Whitehead's, the officers', and the crowd's conduct in context. That made it relevant.

The challenged evidence was also relevant because it tended to make the defendants' testimony that the crowd was hostile more believable. *See Common*, 661 F.3d at 945-46. If the jurors hadn't heard evidence about the traffic stop, Jones fleeing, Daniel's attempt to flee and Officer Bond's physical altercation with him, or Mynatt's refusal to obey police orders and subsequent flight giving rise to a police chase, they would have had little basis to understand why people were gathered around yelling and why the officers had reasonable grounds to promptly maintain control of the crowd. The evidence also made Officer Bond's testimony that he was preoccupied with Daniel even after Daniel was secured in the squad car more believable.

Accordingly, we find that evidence of Daniels', Jones's, and Mynatt's conduct (save testimony concerning the

crack cocaine which we will discuss shortly) relevant in providing the jurors necessary background information and probative in their assessment of the officers' credibility. Although the district court only addressed Whitehead's concerns of undue prejudice briefly, we find no reversible error. We give "special deference" to the district court's evidentiary findings pursuant to Rule 403, *see Common*, 661 F.3d at 946, and we have no basis to second-guess the district court's judgment here.

Evidence that crack cocaine was found in Daniel's car is more problematic. The defendants argue that this evidence was relevant to Daniel's and Jones's incentive to flee. The district court did not address this evidence separately and we are troubled by the evidence's minimal probative value in relation to the danger of unfair prejudice. But even if the district court erred in admitting this evidence, we conclude that it was harmless. *See Cerabio,* 410 F.3d at 994.

The district court could have given a limiting instruction to help alleviate any unfair prejudice, but Whitehead didn't request such an instruction and so none was given. *See United States v. Suggs,* 374 F.3d 508, 517-18 (7th Cir. 2004) (no error where the district court failed to give limiting instruction sua sponte). Even without the instruction, however, the parties told the jury that the case was not about Daniel or what he did, it was about Whitehead and her conduct. Whitehead's counsel explained in closing that it was important for the jury to know why Whitehead and the officers were at the scene, but Daniel is an adult and his conduct cannot be

attributed to his mother. The jury also heard evidence that Whitehead was a professional with a steady job and no criminal record. Nothing in the record indicates that the jury would have attributed Daniel's bad acts, including his possession of crack cocaine, to Whitehead. In light of Lt. Stevens' and Sgt. Stack's testimony of Whitehead's conduct providing probable cause for her arrest, and the background information of Daniel's, Jones's, and Mynatt's conduct that was properly admitted, Whitehead hasn't shown that there was a significant chance that the crack cocaine evidence affected the outcome of the trial.

### b. Evidence of high-violent-crime area

Whitehead sought to bar reference to the 800 block of South Lavergne as a high-crime area, arguing that the evidence had no foundation, had limited relevance, and was highly prejudicial. Initially, we conclude that the district court did not abuse its discretion in ruling that a proper foundation was laid for Officer Bond, Lt. Stevens, and Sgt. Stack to testify, based on their experience patrolling the area for several years, that it was a high-violent-crime area. *See United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) (stating that "specific data" establishing that a location is a "high-crime area" is not required).

We also find that the evidence had some relevance. Contrary to Whitehead's assertions, an officer's supported opinion that an area is a high-violent-crime area can be considered in a probable cause analysis. *See Carmichael v. Vill. of Palatine, Ill.* 605 F.3d 451, 457 (7th

Cir. 2010) ("[P]robable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard.") (emphasis in original) (quotations omitted). When conduct is taking place in a high-crime area, the characteristics of the location may be one factor officers consider under the totality of circumstances when detaining someone.[1] *See United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002); *see also United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010); *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). For this factor to carry weight, there should be a reasonable connection between the neighborhood's higher crime rate and the facts relied upon to support probable cause. *See, e.g., United States v. Tinnie*, 629 F.3d 749, 758 (7th Cir. 2011) (Hamilton, J., dissenting).

---

[1] Both parties assume that Whitehead's seizure amounted to an arrest, but whether her short detention in the prisoner wagon qualifies as an arrest requiring probable cause is debatable. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011); *see also United States v. Tilmon,* 19 F.3d 1221, 1228 (7th Cir. 1994) ("[I]t is not necessarily improper to detain suspects in a police car during some kinds of investigatory stops."). Some force may be reasonable during an investigatory stop when the circumstances give rise to a justifiable fear for personal safety on the part of the officer. *Jewett v. Anders*, 521 F.3d 818, 824-25 (7th Cir.2008). This issue wasn't raised by the defendants, though, and thus, is not an issue we need to explore.

Here, there was a connection. Lt. Stevens was concerned not just with Whitehead's behavior, but also with that of the other people in the crowd (who he testified Whitehead was instigating). In part, because it was a high-violent-crime area, the seemingly agitated crowd posed a greater threat to the officers safety, who feared that violence was more likely to ensue if prompt action wasn't taken to disperse the crowd. The officers could reasonably consider the characteristics of the area in assessing the situation and deciding what action to take to maintain control.

The evidence was relevant, but it was also prejudicial. As we have said though, most relevant evidence is prejudicial, so the issue is whether it was *unfairly* prejudicial. We cannot find that the district court abused its wide discretion in admitting the evidence. Neither party suggests that the probable cause instruction to the jury was an inaccurate statement of the law and thus the jury was properly guided. Further, Whitehead and Donald testified that the neighborhood is mostly compromised of good hardworking homeowners and retired citizens. Donald described the block as "[m]ostly bungalows, retired people, elderly people, . . . working class people . . . It's a middle class neighborhood." Defense counsel didn't refute this more specific description of the block. We do not find that the district court abused its discretion in allowing the jury to hear the parties' differing perceptions of the area.

### III.  Conclusion

For the reasons stated, we AFFIRM the district court's judgment.