2014 UT App 215

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
ROBERT L. MCCULLAR,
Defendant and Appellant.

Opinion
No. 20120648-CA
Filed September 11, 2014

Second District Court, Ogden Department
The Honorable W. Brent West
No. 101900238

Samuel P. Newton, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN and SENIOR JUDGE PAMELA T.
GREENWOOD concurred.[1]

VOROS, Judge:

¶1     Robert L. McCullar was convicted of murdering Filiberto
Robles Bedolla. McCullar told his girlfriend (by then a police
informant) that he had slashed Bedolla's throat with a piece of
broken glass. At trial, McCullar sought to raise a reasonable doubt
of his own guilt by pointing the finger at Dawna Finch, Bedolla's
girlfriend and "main prostitute." The jury convicted McCullar

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by
special assignment as authorized by law. *See generally* Utah Code
Jud. Admin. R. 11-201(6).

without having heard much of the evidence implicating Finch. On appeal McCullar contends that he was unduly restricted in attempting to present his defense to the jury. We agree. We therefore reverse McCullar's conviction and remand for further proceedings.

BACKGROUND[2]

*The Murder*

¶2    Filiberto Robles Bedolla and his roommate shared a studio apartment in Ogden. Bedolla's roommate spent the morning of December 22, 2009, looking for work. When he returned to the apartment that afternoon to drop off groceries, he noticed Bedolla still in bed, completely under a bedsheet. The roommate said, "Hey buddy," but Bedolla did not respond. As the roommate left the apartment, he ran into Bedolla's brother. The two returned to the apartment to wake Bedolla. The roommate shook Bedolla's foot but Bedolla did not respond. Bedolla's brother then pulled back the bedsheet. Bedolla was dead, his bedding bloodstained, his neck covered with stab wounds. The fly on his jeans was unbuttoned and a pornographic movie was playing on a loop on the television near the foot of his bed.

¶3    The crime scene revealed no obvious suspect. The first officer to arrive saw no evidence of a struggle, and the door showed no sign of forced entry. Bedolla's wounds indicated that the killer used a knife with a single-edged blade, but police found no weapon at the scene. Investigators found blood prints on a lightswitch, a doorknob, and a DVD case, all left by someone

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Brown*, 948 P.2d 337, 339 (Utah 1997). "We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

wearing knit gloves. They also found blood prints on an outturned pocket of Bedolla's jeans. Three thousand dollars in cash, with which Bedolla had intended to purchase a car, was missing.

*The Investigation*

¶4     Police focused initially on two suspects: Bedolla's roommate and Dawna Finch, a woman investigators described as Bedolla's "main prostitute." One detail in particular piqued police interest in Finch. Bedolla reportedly kept a picture of Finch on his headboard. The picture was gone when Bedolla's body was found.

¶5     Other suspects soon emerged. An informant told police of a woman seen sharpening a crack pipe, and police briefly entertained a theory that Bedolla's wounds could have been caused by that type of weapon. Another informant told police that a local man named Michael had bragged about committing the murder.

¶6     But the police investigation eventually narrowed to a single suspect: Robert McCullar. Police first sought out McCullar because they believed he might provide them with information about Finch. Soon after their search began, McCullar approached two officers on the street. He had heard police were investigating "a murder or something" and were looking for him. McCullar seemed to be unfamiliar with the details of the investigation. He believed the murder had taken place the previous Friday, for example, when it had actually taken place the previous Tuesday. He told police, "This is bullshit. I didn't do no murder. I don't even know the guy." But McCullar then asked the police why they were investigating him "if there was no forced entry" into Bedolla's apartment. That question struck the officers as suspicious—they considered the lack of a forced entry to be a nonpublic detail of the crime.

¶7     Several weeks later police received another tip. While in custody after a drug arrest, a woman named Donna Major told police that she had information about the Bedolla murder. She told

police that she and McCullar were "close associates" and that McCullar had "made some comments and statements that led her to believe that he was the murderer." Major first told police that Finch was in Bedolla's apartment when McCullar killed him. But Major changed her story, telling police that she had been with McCullar herself and had smoked a cigarette outside Bedolla's apartment as McCullar killed Bedolla. When McCullar emerged from Bedolla's apartment building, Major said, blood marked his clothing.

*McCullar's Confessions and Trial*

¶8     Major did, in fact, know McCullar well. They met in the summer of 2009 and, for some time, had a romantic relationship. Though that relationship ended before police began investigating McCullar, during the investigation Major still told McCullar that she loved and cared for him and that she wanted to leave Ogden and run away with him to Dallas. Major testified that neither of them ever "totally gave up" on the relationship and that she thought McCullar "still had feelings" for her. Major also testified that she believed she was able to "manipulate those feelings" to "get [McCullar] to confess or incriminate himself" in Bedolla's murder.

¶9     In spite of their affection, Major was angry at McCullar for his failure to bail her out of jail when she was held on drug charges. In a conversation from jail, Major "vented" to McCullar about her "so-called friends" who never "step up for you when you need them." Major told McCullar, "When I get out of here, . . . karma is coming to town and that bitch is named Donna."

¶10     Though they were skeptical of her initial story implicating McCullar in Bedolla's murder, police remained interested in Major's willingness to implicate McCullar. Major told police she could "set up a meeting" and "get a confession" from McCullar. Police told Major that if she did, they might be able to negotiate her release from prison and drop the felony drug charge against her.

¶11   Once Major agreed to cooperate with an investigation into McCullar's involvement in the murder, police "initiated the discussion that led to her release." They then outfitted a hotel room with a modified clock radio capable of audio and video recording. McCullar met Major at the hotel room, and police monitored and recorded at least an hour and fifteen minutes of McCullar's activity in the hotel room. During his conversation with Major, McCullar confessed to killing Bedolla. He told Major that after a "run in" with Bedolla, he followed Bedolla home, scooped up a piece of broken glass outside the apartment complex, barged through the apartment door before Bedolla could close it, and cut Bedolla's throat. As McCullar described the killing to Major, he indicated the length and location of the fatal wound by tracing a path with his finger from "right under the right ear to about the center" of the throat.

¶12   While in prison awaiting trial, McCullar met a pastor serving five years to life for statutory rape. On one occasion, McCullar asked the pastor, "Does God forgive murder?" On another occasion, McCullar seemed to acknowledge killing Bedolla, saying, "That paisa motherfucker, I had to handle my business, and so I had to do what I had to do."[3] McCullar told the pastor he "left the body" at the scene of the crime and that "he didn't think it would be found for anywhere from 12 to 24 hours." McCullar also suggested that he was not alone at the murder scene. As the pastor related it, McCullar "was very frustrated" with a woman named

---

3. "Paisa" is short for "paisano," Spanish for "countryman." But the slang term, widespread in U.S. prisons, carries another connotation: a Mexican living in the United States who speaks little English or who resists assimilation. *See* Gustavo Arellano, *How Insulting*, Sacramento News & Review (May 13, 2010), http://www.newsreview.com/sacramento/how-insulting/content?oid=1423233; *see also Paisa*, Urban Dictionary, http://www.urban-dictionary.com/define.php?term=paisa (last visited July 22, 2014); *Pisa*, Urban Dictionary, http://www.urbandictionary.com/define.php?term=pisa (last visited July 22, 2014).

"Dawanna," because "if she hadn't gone back inside to get something else and . . . [left] a piece of evidence behind," McCullar believed he "would have got off."

¶13   Those confessions anchored the State's case against McCullar. In fact, the prosecutor's closing argument began, "I'm a little surprised that [Bedolla's roommate] is still being talked about as a suspect, but when you have a client that confessed to committing a murder and gave numerous specific details about that murder, you throw everything against the wall and see what sticks." Several minutes later, the prosecutor closed, "Ladies and gentlemen, we don't know everything that happened. We don't know exactly how . . . . [But McCullar] knew way too many details . . . . You don't come up with those by guessing. . . . You come up with those because you were there, and you did it, and that's why I'm asking you to find the defendant guilty."

¶14   McCullar countered that his confessions did not square with other evidence and that he had confessed to Major because he believed that if he did, she would run away with him to Dallas. McCullar denied confessing to the pastor and pointed out several flaws in the pastor's testimony. McCullar also sought to present an alternative theory to the jury: the evidence at the scene and the testimony of key witnesses strongly suggested that Dawna Finch killed Bedolla. But several evidentiary rulings by the trial court kept McCullar from fleshing out that theory.

*McCullar's Excluded Defense*

¶15   At trial, McCullar drew the jury's attention to evidence from the crime scene that seemed inconsistent with the State's account of how Bedolla was killed. Bedolla was found on his bed, across the room from the apartment door. His pants were undone, his jeans pocket turned out, and three thousand dollars gone. A pornographic movie played on a loop on the television at the foot of his bed. Bedolla's roommate spent the night in the apartment,

got ready for work the next morning, and returned to drop off groceries, all without noticing any sign of a struggle.

¶16    McCullar's defense strategy was to draw these loose evidentiary strands together to create a story undermining McCullar's confession. To do so, he depended on witness testimony to answer the question central to his defense: If McCullar didn't kill Bedolla, who did?

¶17    The answer, McCullar intended to argue, was Dawna Finch. In McCullar's view, Bedolla's murder matched Finch's pattern of violent behavior. Two of Bedolla's friends told police that they had witnessed a violent outburst by Dawna Finch six to eight months before Bedolla was killed. In that attack, they reported, Finch pinned a man to a bed and held a pair of scissors to his throat in a dispute over drug money. McCullar also intended to argue that Finch had threatened Bedolla just before he was killed. A convenience-store clerk told police that several days before Bedolla was killed, he came into the store and said that Finch had demanded money and threatened to come to his apartment and rob him if he didn't pay. McCullar also believed he could provide evidence that Bedolla took that threat seriously. Bedolla's landlord told police that Bedolla seemed out-of-sorts in the days before he was killed and had shared his plan to move to California. According to McCullar's theory, Bedolla's fear of Finch motivated him to plan the move.

¶18    McCullar also planned to introduce expert testimony supporting his theory that Bedolla was killed by someone he knew well. McCullar's expert planned to testify that bloody marks left on the deadbolt switch indicated that the deadbolt had been thrown when the murder took place. Finally, McCullar intended to present evidence that the cash missing from Bedolla's pocket ended up in Finch's hands. One of Finch's acquaintances told police that the day after Bedolla was killed, Finch came to her door and asked to use her phone. Finch "had money" that day, the acquaintance reported, and showed "a wad of it."

¶19    The trial court excluded the testimony of Bedolla's friends, his landlord, and the convenience-store clerk. The statements of all four witnesses, the court concluded, were "inadmissible hearsay and hence properly subject to the exclusionary rule." The probative value of the statements by Bedolla's friends, the trial court added, was "substantially outweighed by the danger of prejudice to the State and to Ms. Finch, as well as the danger of confusing the jury, because Ms. Finch is not being tried." At the hearing on the State's motion in limine to exclude the testimony, the trial court emphasized, "Ms. Finch is not on trial. She's not. You want to point the finger at her, and that's where I make the distinction between trying Ms. Finch as part of the defense or raising reasonable doubt as to McCullar." The trial court also excluded the expert testimony analyzing the blood on the deadbolt switch. Given the trial court's resistance to testimony implicating Finch, McCullar did not attempt to introduce at trial the testimony about Finch's "wad of money."

¶20    The jury found McCullar guilty of first-degree murder and the trial court sentenced him to fifteen years to life. McCullar submitted a motion for new trial, arguing in part that the trial court erred by excluding testimony that implicated Finch. The trial court denied the motion. McCullar appeals.

ISSUES AND STANDARDS OF REVIEW

¶21    McCullar first contends that the trial court improperly excluded witness testimony that implicated Finch. The trial court deemed the proposed testimony of several witnesses inadmissible hearsay. "Our standard of review on the admissibility of hearsay evidence is complex, since the determination of admissibility 'often contains a number of rulings, each of which may require a different standard of review.'" *State v. Workman*, 2005 UT 66, ¶ 10, 122 P.3d 639 (quoting Norman H. Jackson, *Utah Standards of Appellate Review—Revised*, Utah Bar J., Oct. 1999, at 8, 38 (1999)). We review the legal determinations leading to an admissibility ruling for correctness. *Id.* We review the factual findings for clear error. *Id.*

And we review the admissibility ruling itself for abuse of discretion. *Id.*

¶22    McCullar next contends that the trial court improperly excluded evidence of Finch's prior violent acts under rule 403 of the Utah Rules of Evidence. We disturb a trial court's decision to exclude evidence only if we conclude the court abused its discretion. *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269. "However, when the evidentiary ruling at issue" rests upon "an independent legal issue and does not involve the balancing of factors, we review the determination for correctness." *State v. Whittle*, 1999 UT 96, ¶ 20, 989 P.2d 52.

¶23    McCullar also contends that the trial court improperly restricted the testimony of one of his expert witnesses, that the trial court erred by admitting his confessions without determining their trustworthiness, and that investigators' warrantless surveillance of a hotel room violated his rights under the Fourth Amendment and article I, section 14 of the Utah Constitution. Because we reverse on the basis of the exclusion of evidence relating to Dawna Finch, we do not reach these issues.

ANALYSIS

¶24    Taken together, McCullar's evidentiary arguments coalesce into a constitutional claim: that the trial court's evidentiary decisions denied him a "meaningful opportunity to present a complete defense." *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal quotation marks omitted). We first examine the trial court's exclusions individually then consider them together to determine whether the evidentiary rules the court applied infringe upon "a weighty interest of the accused" and whether they "are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 330 (2006) (citation and internal quotation marks omitted).

A.      Hearsay Exclusions

¶25    McCullar contends that the trial court improperly excluded the testimony of two witnesses: a clerk at a convenience store near Bedolla's apartment and Bedolla's landlord. McCullar first argues that he did not seek to introduce the testimony "to prove the truth of the matter asserted" and that the testimony was therefore nonhearsay. But if the testimony was hearsay, McCullar argues, it fell within the state-of-mind or prior-testimony exceptions to the hearsay rule. Finally, McCullar argues, if the testimony fell outside those two exceptions, the court should have admitted it under rule 807, which provides a "residual exception" to the hearsay rule.

¶26    Out-of-court statements offered to prove the truth of the matter asserted are hearsay. Utah R. Evid. 801(c). Courts will not admit a hearsay statement unless the statement falls within one of the exceptions contained in rules 803, 804, and 807 of the Utah Rules of Evidence. *See id.* R. 802.

¶27    Conversely, out-of-court statements not offered to prove the truth of the matter asserted are by definition not hearsay. *Id.* R. 801(c). In *State v. Sibert*, our supreme court explained that a witness offering hearsay testimony is "not testifying from his own knowledge or observation, but is acting as a conduit to relay that of others." 310 P.2d 388, 390 (Utah 1957). But in many cases a witness who "relates what he heard someone else say" does not "purport[] to represent that the statement he heard is true." *Id.* Rather, the witness offers the testimony "simply to prove that someone else made a statement without regard to whether it be true or false." *Id.* In that case, the witness "assert[s] under oath a fact that he personally knows, that is, that the statement was made." *Id.* at 391. The hearsay rule does not bar this type of testimony. *Id.*[4]

---

4. Statements of this type may be "relevant because of [their] impact on the hearer" and have "consistently been held to be

(continued...)

¶28 Here, the clerk and the landlord both planned to testify about statements Bedolla made before he was killed. Before we ask whether this proposed testimony fit within a hearsay exception, we must ask whether the proposed testimony amounted to hearsay. Specifically, we ask whether McCullar offered the testimony of the clerk and the landlord as evidence that Bedolla's statements were true, or simply to prove that Bedolla made them. We conclude that McCullar offered the clerk's and landlord's testimony to prove that Bedolla made the statements and that the declarants reported them to police, and thus that police failed to adequately investigate the person Bedolla's statements implicated: Dawna Finch. They were, consequently, nonhearsay.

¶29 Soon after Bedolla was killed, police interviewed a clerk at a convenience store near Bedolla's apartment who knew both Bedolla and Finch. The clerk told police that one or two days before he was killed, Bedolla stopped by the convenience store. Bedolla told him "that he was having problems with his girlfriend Dawna." Bedolla also said that "Dawna had recently visited [him] and asked for money" and that Bedolla "told Dawna that he had money but that he wasn't going to give it to her because of the way she had been behaving." Bedolla "explained that Dawna had been out in the streets and using drugs." He confided to the clerk that after he refused to give her money, "Dawna became very angry and threatened to return and rob [Bedolla] of all of his things."

¶30 Around the same time, police interviewed Bedolla's landlord. The landlord reported that he had spoken to Bedolla three days earlier. In the landlord's account, Bedolla told him that

4. (...continued)
nonhearsay in a variety of contexts." R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 724 (2014). In slip-and-fall cases, for example, testimony of prior complaints about a slick floor "may be admissible not to prove that the surface was slippery on a particular occasion, but to prove that the defendant had notice of the slippery condition." *Id.*

he planned to move out of the apartment by the end of the month and relocate to California. The landlord stated that Bedolla "was brief and straight to the point" and that his tone was "courteous but disheveled." The landlord added that he "knew [Bedolla] well" and "felt something had changed in his world by the way he was talking." The landlord concluded, "I felt concerned for him [and] I can't explain why."

¶31    The trial court concluded that Bedolla's conversations with the clerk and his landlord fell "directly within the definition" of hearsay because they occurred outside "the confines of a court proceeding" and McCullar offered the conversation "specifically to show that Ms. Finch made threats against the victim."

¶32    But the statements the trial court excluded were not necessarily hearsay: they were offered at least in part to demonstrate the inadequacy of the police investigation and, by extension, to raise a reasonable doubt about McCullar's guilt.

¶33    At a pretrial hearing, McCullar tied his evidence of third-party guilt to a failure-to-investigate theory. Put simply, McCullar argued that police had failed to fully investigate Dawna Finch as a suspect. The trial court expressed concern that McCullar was trying to prove Dawna Finch killed Bedolla with what it "consider[ed] to be some difficult witnesses and some difficult hearsay [evidence]." McCullar's attorney responded, "[W]e're not trying to prove that Dawna did it. We're only trying to raise doubt concerning Mr. McCullar's involvement in this." McCullar's attorney continued, explaining how this overlooked evidence suggested that the police were trying to make the evidence conform to their theory of the case:

> By pointing the finger at someone else, that is certainly going to raise doubt . . . . This is not hypothetical. I'm not pulling stuff out of thin air. I'm pulling this from police reports, from the investigation conducted . . . . I have the right to

> question the officers concerning . . . these statements. What did they do as a result?
>
> Did they go back and question Dawna Finch? Did they grill her on the fact that these guys said she was violent, these guys said that, you know, she threatened him? This person said the few hours after the killing she had a wad of cash in her hand?
>
> I mean your Honor, I have—like I say, this is just the tip of the iceberg of what we have on Dawna Finch. If the State—if the officers do not follow up on this and they're trying to make the evidence conform with their theory of the case, then I have a right to bring that out.

¶34 Under McCullar's failure-to-investigate theory, the fact that the clerk and landlord reported their conversations with Bedolla to police carried significance even if the content of the conversations was not true, because those reports served as evidence that police failed to fully investigate the murder. The clerk's and landlord's statements were therefore offered not only for their truth, but also for a separate, nonhearsay purpose: to show that police failed to follow up on credible tips. Because McCullar sought to introduce the clerk's and landlord's testimony for this purpose, the testimony qualified as nonhearsay.

¶35 Even if third-party-guilt evidence escapes the reach of the hearsay rule, it must of course be relevant to be admissible. In *United States v. Lecco*, for example, the defendant argued that a witness's out-of-court statements to police demonstrated police misconduct. 438 F. App'x 187, 190 (4th Cir. 2011). The trial court excluded the statements as hearsay. *Id.* at 189. However, the Fourth Circuit Court of Appeals agreed with the defendant "that the proffered evidence was not hearsay, as it was not offered for the truth of the matter asserted." *Id.* at 190. But unlike McCullar, the defendant in *Lecco* never argued police misconduct as a defense before the trial court. The *Lecco* court therefore concluded that "it

was within the district court's discretion to exclude the evidence as irrelevant." *Id.* at 190–91.

¶36    We adopt the same approach here. The hearsay rule does not bar evidence of third-party guilt introduced to demonstrate shortcomings in a police investigation. But a trial court may nevertheless exclude nonhearsay evidence of third-party guilt if the evidence is irrelevant. Utah R. Evid. 401, 402. For example, information implicating a third party would be relevant under a failure-to-investigate theory "only if police learned of the information during their investigation." *See Commonwealth v. Ridge*, 916 N.E.2d 348, 358 (Mass. 2009).

¶37    Here, not only had police learned of the third-party guilt evidence McCullar sought to introduce, the evidence was derived from police reports. McCullar points to four separate police reports that either named or described Finch as a potential suspect. Tellingly, the State has never denied that Finch may have played a part in the murder. For example, the prosecutor introduced evidence of Finch's involvement in the crime: McCullar's confession to the pastor, which included a reference to a woman named "Dawanna" who left evidence at the scene. And on appeal, the State argued that "evidence that [Dawna Finch] may have been involved in the murder" does not "exculpate [McCullar]."[5] We

---

5. The State argues that for evidence of third-party guilt to be admissible, the evidence must "point directly to the third party's guilt" and be inconsistent with the defendant's guilt. Such evidence would undoubtedly be relevant and thus presumptively admissible. But we see no need to adopt special corollaries to the general rule of relevance for evidence of this type. Evidence of third-party guilt may contribute to a jury's reasonable doubt despite not being strictly inconsistent with a defendant's guilt. For example, an eyewitness could identify a third party and the defendant as co-perpetrators of a crime, but do so with varying degrees of reliability. Or an eyewitness might testify that she saw

(continued...)

therefore conclude that the clerk's and landlord's testimony was relevant nonhearsay. Accordingly, the trial court erred in excluding it.

¶38    To support its exclusion of the clerk's and landlord's testimony, the trial court relied upon *State v. Wauneka*. In *Wauneka*, a husband called police to report that his wife "appeared to be dead." 560 P.2d 1377, 1378 (Utah 1977). The husband claimed his wife's death was accidental. But the medical examiner testified that Wauneka's wife had seventy-five bruises on her body and that her death "was caused by a blow from a fist and then by a fall." *Id.* The prosecution argued that Wauneka had beaten his wife to death and that the fatal attack was part of a pattern of abuse. An acquaintance testified that less than a week before her death, the wife had implored her, "You call the police for me—I can't, if [my husband] finds out I called the police, he'll kill me." *Id.* A social worker testified that the day before her death, Wauneka's wife told her that "if she left her husband, he would kill her." *Id.*

¶39    The *Wauneka* trial court admitted the hearsay testimony of the acquaintance and the social worker "for the limited purpose of showing [the wife's] state of mind" at the time she made the statements. *Id.* Wauneka was convicted of manslaughter. *Id.* Our supreme court reversed Wauneka's conviction, holding that the trial court erred in admitting the hearsay statements. *Id.* at 1381. Whether Wauneka's wife "feared him or ignored him," the court declared, "throws no light on his guilt or innocence." *Id.*

¶40    The State argues that the reasoning underlying *Wauneka* applies here. In the State's view, McCullar's "claim that Finch was

---

5. (...continued)
half a dozen unknown perpetrators, undermining the prosecution's theory that the defendant acted alone. We therefore leave it to trial courts to determine in the first instance whether evidence of third-party guilt has any tendency, in the context of a given case, to make a defendant's guilt more or less probable. *See* Utah R. Evid. 401(a).

a 'credible suspect' depended entirely on the truth of the matters asserted—that Finch threatened to take [Bedolla's] money." We disagree. This would of course be true if McCullar's object had been to prove that Finch was the killer. But his object instead was to raise an evidence-based doubt in the jurors' minds that he was the killer. One way he sought to do this was to plant doubt as to the adequacy of the police investigation.

¶41    Accordingly, while the trial court correctly observed that both *Wauneka* and the present case involve out-of-court statements of threats against the declarant, the statements were offered for quite different purposes. The statements excluded in *Wauneka* were offered under the state-of-mind exception to the hearsay rule. But the statements excluded here were relevant irrespective of their truth, and thus were not excludable as hearsay.

¶42    Incidentally, *Wauneka* recognized that its rule would prove a poor fit when a defendant offers evidence of third-party guilt. In assessing the relevance of a murder victim's statements, the *Wauneka* court speculated, "Perhaps such statements would be relevant where there is a question as to the identity of the one who committed the homicide." 560 P.2d at 1380.[6] A decade later, in *State*

---

6. This passage from *Wauneka* appears to blend two distinct inquiries: whether a statement is hearsay and whether a statement is relevant. *Wauneka* drew heavily from *United States v. Brown*, a D.C. Circuit case that expounds on the state-of-mind hearsay exception and relevance requirements. *See* 490 F.2d 758 (D.C. Cir. 1973). *Brown*'s conclusion is straightforward, as is its application here. "A statement which would be pure hearsay as to the truth of the matters alleged" may nevertheless be admitted if the statement is introduced for a nonhearsay purpose, such as to prove the declarant's state of mind. *Id.* at 763. But the hearsay exemptions and exceptions still "must be applied with due deference to another fundamental concept in the law of evidence—that of relevance." *Id.*

   *Wauneka*'s concern about the relevance of hearsay-exception statements also reflects a previous version of the state-of-mind

(continued...)

*v. Auble*, our supreme court reiterated that hearsay statements made by a murder victim may be admissible under the state-of-mind exception "if the identity of the killer is at issue." 754 P.2d 935 (Utah 1988). In short, both *Wauneka* and *Auble* took pains to exclude from their holdings cases like this one, in which the identity of the killer is at issue. Accordingly, *Wauneka*'s bar to the admissibility of hearsay evidence of third-party guilt does not apply.

¶43   McCullar's efforts to raise a reasonable doubt of his guilt hinged on his failure-to-investigate theory. The trial court should have admitted the clerk's and landlord's testimony for that purpose. The trial court accordingly erred by excluding this testimony entirely.[7]

B.     Rule 403 Exclusions

¶44   McCullar next contends that the trial court improperly excluded other evidence of Finch's guilt under rule 403. Two of Bedolla's friends were prepared to testify that they had seen Finch attack another friend with a pair of scissors and threaten to stab him if he wouldn't give her money. In McCullar's view, "the fact that Finch violently assaulted other men over their failure to provide her with drug money helps establish her identity as the killer in this case." McCullar argues that because the friends'

---

6. (...continued)
hearsay exception. Utah rule of evidence 63(12), the predecessor of our current rule 803, provided that "a statement of the declarant's . . . then existing state of mind" may be admissible "when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant." Utah R. Evid. 63(12) (1971). Our current state-of-mind exception does not refer to relevance.

7. Because we conclude that the trial court should have admitted the clerk's testimony for a nonhearsay purpose, we do not reach McCullar's argument that the testimony falls under one of three exceptions to the hearsay rule. *See supra* ¶ 25.

testimony pointed to the actual culprit, formed a necessary part of his defense, and had no "unusual propensity" to inflame the jury, it should have been admitted under rule 403.

¶45    A court may exclude evidence under rule 403 if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Utah R. Evid. 403. In short, the trial court considering the admissibility of evidence under rule 403 seeks to balance two competing concerns, "excluding the . . . evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *State v. Verde*, 2012 UT 60, ¶ 18, 296 P.3d 673.

¶46    Under rule 403, whether evidence is presumed admissible or inadmissible depends on the nature of the evidence. If the evidence has no "unusual propensity to unfairly prejudice, inflame, or mislead the jury," we will "indulge a presumption in favor of admissibility." *State v. Dunn*, 850 P.2d 1201, 1221–22 (Utah 1993). But if the evidence does exhibit that type of "unusual propensity," the presumption shifts, and we require "the proponent to show that the evidence has unusual probative value." *Id.* at 1222. For example, under rule 403, Utah courts have approved the exclusion of gruesome crime-scene photos, rape victims' sexual histories, and pseudoscientific methodologies.[8]

---

8. For examples of each of these categories, see *State v. Lafferty*, 749 P.2d 1239, 1256–57 (Utah 1988) ("[T]here is no legitimate need for the gruesome photographs of a homicide victim's corpse . . . ."); *State v. Johns*, 615 P.2d 1260, 1264 (Utah 1980) ("[A]bsent circumstances which enhance its probative value, evidence of a rape victim's sexual promiscuity . . . is ordinarily insufficiently probative to outweigh the highly prejudicial effect of its introduction at trial."), *holding now embodied in* Utah R. Evid. 412; and *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986) ("[Statistical analysis is] particularly inappropriate when used to establish facts

(continued...)

¶47    The testimony McCullar sought to introduce here carries no unusual propensity to unfairly prejudice, inflame, or mislead the jury. Shortly after Bedolla's murder, police interviewed two of his friends, and the two men provided similar accounts of an incident that occurred six months earlier. The police report summarizing the story they related depicts an attack remarkably similar to the attack on Bedolla:

> [Bedolla's two friends] and two other men . . . were all at [one friend's] apartment. Dawna [Finch] knocked on the door and was let in. Dawna was on a tangent and wanted money for drugs. The men told Dawna that they didn't have any money and she got mad. Dawna tackled [one man] onto a bed and was choking him with one hand. In the other hand Dawna was holding a pair of scissors. Dawna threatened to kill [the man] unless they gave her money. [One friend] gave Dawna seven dollars and then she left. Both of the men said that there were other instances that Dawna has threatened them and that she is very violent.

Because the testimony describing Finch's earlier attack had no "unusual propensity to unfairly prejudice, inflame, or mislead the jury," it enjoyed a presumption of admissibility. *See Dunn*, 850 P.2d at 1221–22.

¶48    In addition, the testimony had little potential to create a danger of unfair prejudice. "Evidence is not unfairly prejudicial simply because it is detrimental to a party's case." *United States v. Magleby*, 241 F.3d 1306, 1315 (10th Cir. 2001); *see also State v. Kooyman*, 2005 UT App 222, ¶ 26, 112 P.3d 1252. Any evidence that supports a defendant's innocence prejudices the prosecution's

---

8. (...continued)
not susceptible to quantitative analysis, such as whether a particular individual is telling the truth at any given time." (citation and internal quotation marks omitted)).

case.[9] Rule 403 does not guard against the danger of prejudice—it guards against the danger of unfair prejudice.[10]

¶49     The trial court also expressed concern that the friends' testimony would prejudice Dawna Finch. But concerns about prejudice to third parties have no place in rule 403 analysis: our unfair-prejudice rule asks only whether the evidence possesses "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v.*

---

9. The observation that all useful evidence is prejudicial is by now commonplace. *See, e.g.*, *Parish v. City of Elkhart*, 702 F.3d 997, 1001 (7th Cir. 2012) ("The most relevant evidence is, by its nature, prejudicial, but it is only *unfair* prejudice that requires exclusion."); *United States v. Jenkins*, 126 F. App'x 187, 188 (5th Cir. 2005) (per curiam) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, that permits exclusion under Rule 403." (citation and internal quotation marks omitted)); *United States v. Rodriguez-Estrada*, 877 F.2d 153, 156 (1st Cir. 1989) ("By design, all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided.").

10. Federal courts routinely emphasize this important distinction between prejudice and unfair prejudice in the context of the federal rule 403, which is identical to the Utah rule. *See, e.g.*, *United States v. Morales–Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) ("In balancing the scales of Rule 403, it is important to note that only 'unfair' prejudice is to be avoided . . . ."); *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000) ("As has been stated many times, Rule 403 does not protect a party from all prejudice, only unfair prejudice."); *Veranda Beach Club Ltd. P'ship v. Western Sur. Co.*, 936 F.2d 1364, 1372 (1st Cir. 1991) ("[T]rials were never meant to be antiseptic affairs; it is only unfair prejudice, not prejudice per se, against which Rule 403 guards."); *United States v. Williams*, 816 F.2d 1527, 1532 (11th Cir. 1987) ("Only 'unfair' prejudice is prohibited by Federal Rule of Evidence 403. This court has invariably held that determining prejudice to outweigh probativeness under rule 403 is an exceptional remedy.").

*Maurer*, 770 P.2d 981, 984 (Utah 1989) (quoting Michael Graham, *Handbook of Federal Evidence* § 403.1, at 178 (2d ed. 1986)); *see also United States v. Epperson*, 528 F.2d 48, 50 (9th Cir. 1975) ("[I]t is an axiom of the law of evidence that information will be excluded when its probative effect is outweighed by its prejudice to the opposing party."); *United States v. Patterson*, 495 F.2d 107, 112 (D.C. Cir. 1974) (same).[11] A jury's belief that police settled on the wrong suspect is not an improper basis for a decision. In fact, given the "measure of certainty the law demands before finding guilt," a jury's belief that the defendant has been falsely accused *must* be a permissible basis for a decision, lest we jeopardize our commitment to "preventing the conviction and punishment of the innocent." *See State v. Reyes*, 2005 UT 33, ¶¶ 11–12, 116 P.3d 305.

¶50    For the same reason, the trial court's concern that the friends' testimony may confuse the issues or mislead the jury is misplaced. The primary issue facing the jury was whether McCullar killed Bedolla. Evidence that someone else may have killed Bedolla may have contributed to a reasonable doubt of McCullar's guilt. To the extent that Finch's potential guilt does not exculpate McCullar—because they both had a hand in Bedolla's murder, for example—we believe a jury is well equipped to weigh the possibility that two people may have been involved in a criminal act.

¶51    On the other hand, this testimony had significant probative value. McCullar's theory of the case cast Dawna Finch as Bedolla's killer. McCullar intended to offer the friends' statements, recorded in police reports, as evidence that police had improperly curtailed their investigation of Finch. Given McCullar's theory of the case, evidence that Finch had been involved in a similar altercation only months before Bedolla's murder and that witnesses had reported

---

11. Examples of an improper basis for a decision include bias, sympathy, hatred, contempt, retribution, and horror. *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (citing Michael Graham, *Handbook of Federal Evidence* § 403.1, at 182–83 (2d ed. 1986)).

the altercation to police investigating the murder carries significant probative value. That probative value is enhanced by the paucity of physical evidence linking McCullar to the crime scene and by the crime-scene details suggesting that Bedolla had been killed by someone he knew well. *See supra* ¶¶ 15–18.

¶52 In sum, the friends' testimony carried significant probative value and created little danger of unfair prejudice. Accordingly, the trial court exceeded its discretion by failing to "indulge a presumption in favor of admissibility" and by excluding their testimony at trial. *See State v. Dunn*, 850 P.2d 1201, 1221–22 (Utah 1993).

C. McCullar's Right to Present a Defense

¶53 The trial court erred by excluding the convenience-store clerk's and landlord's testimony reporting the conversations they had with Bedolla days before Bedolla died. The trial court also erred by excluding Bedolla's friends' testimony about Finch's prior violent acts. But our analysis does not end there. An erroneous decision to exclude evidence constitutes reversible error only if the error is harmful. *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995). And "[a]n error is harmful if it is reasonably likely that the error affected the outcome of the proceedings." *Id.* at 1378–79. In short, we will reverse McCullar's conviction only if we are convinced that the trial court's erroneous exclusions made "the likelihood of a different outcome . . . sufficiently high to undermine confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987).

¶54 McCullar argues that the trial court's evidentiary exclusions kept him from presenting his theory of the case: that the crime-scene evidence and the testimony of those who knew Bedolla pointed to Finch as the killer. McCullar made the same argument before the trial court on his motion for new trial: "In this case, the [trial] court did not allow [McCullar] to present witnesses and defenses on his own behalf. . . . This issue rises above mere evidentiary decisions and involves Mr. McCullar's constitutional

right to present relevant evidence directly bearing upon his theory of the defense."

¶55   A series of United States Supreme Court cases emphasizes a defendant's constitutional right to present a complete defense. The rule first appeared in *Washington v. Texas*:

> The [Sixth Amendment] right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present the defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.

388 U.S. 14, 19 (1967). The Court reasoned that a trial court better protects a defendant's constitutional rights by allowing the jury to determine the usefulness of testimony rather than by wielding the rules of evidence to keep out testimony of questionable use:

> "[It is] the conviction of our time that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court."

*Id.* at 22 (quoting *Rosen v. United States*, 245 U.S. 467, 471 (1918)). The Court expressed a similar sentiment several years later in *Chambers v. Mississippi*, in which it reversed a defendant's conviction after a trial court applied the state's voucher and hearsay rules to exclude exculpatory testimony: "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." 410 U.S. 284, 303 (1973). Thus, "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal quotation marks omitted). And that right is abridged by evidentiary rulings that infringe upon "a weighty interest of the

accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 319–20 (2006) (citation and internal quotation marks omitted).

¶56 Here, the trial court's erroneous evidentiary exclusions deprived McCullar of a meaningful opportunity to present a complete defense. Both *Chambers* and *Holmes* involve the dispute at issue here: the exclusion of evidence of third-party guilt. When a defendant theorizes that a third party committed the charged offense, and when admissible evidence supports that theory, the defendant's constitutional right to present a defense is implicated. "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 303; *see also Holmes*, 547 U.S. at 331 (concluding that a South Carolina rule excluding evidence of third-party guilt when the prosecution has presented strong evidence of a defendant's guilt "violates a criminal defendant's right to have a meaningful opportunity to present a complete defense" (citation and internal quotation marks omitted)). Excluding evidence on the theory that the third party is not on trial may—and did here—unduly limit the defendant's ability to present his own theory of the case. As the Supreme Court explained in *Holmes*, "Just because the prosecution's evidence, *if credited*, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case." 547 U.S. at 330.

¶57 One group studying juror decision-making sought to "clarify precisely what the right to present a defense actually means." John H. Blume et al., *Every Juror Wants a Story: Narrative Relevance, Third Party Guilt and the Right to Present a Defense*, 44 Am. Crim. L. Rev. 1069, 1099 (2007). They reasoned that "the right to present a complete defense includes the right to tell a plausible story if the defendant has one." *Id.* The group also noted that "[t]he Supreme Court has already recognized the basic principles of narrative relevance in its decision in *Old Chief v. United States*." *Id.*

at 1100. In *Old Chief*, the Court stated, "Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." 519 U.S. 172, 187 (1997).

¶58    Here, the exclusion of evidence that Finch threatened Bedolla days before his death and that she had attacked other men in past drug-money thefts prejudiced McCullar by leaving factual gaps in his defense theory. In closing argument, vague references to a third party's possible guilt or an incomplete police investigation cannot compensate for the absence of specific evidence implicating a particular person and suggesting the police failed to fully investigate that suspect. As Justice Souter emphasized in *Old Chief*, a jury's willingness to acquit a defendant depends largely on the cohesiveness of a defendant's story:

> A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard.

*Id.* at 189.

¶59    In sum, the erroneous evidentiary exclusions deprived McCullar of a "meaningful opportunity to present a complete defense." *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal quotation marks omitted). They thus made "the likelihood of a different outcome . . . sufficiently high to undermine [our] confidence in the verdict." *See State v. Knight*, 734 P.2d 913,

920 (Utah 1987). We reverse McCullar's conviction on this ground.[12]

¶60    Because we reverse McCullar's conviction based on the erroneous evidentiary exclusions, we do not address McCullar's claims based on the exclusion of expert-witness testimony, the trustworthiness of his confession, and the admissibility of evidence gathered using warrantless hotel-room surveillance.

## CONCLUSION

¶61    The trial court erred by excluding the testimony of the convenience-store clerk, the testimony of Bedolla's landlord, and the testimony of Bedolla's two friends. That error prejudiced McCullar. We therefore reverse McCullar's conviction and remand for further proceedings consistent with this opinion.

---

12. Our holding does not bar a retrial. "The principle that [the Double Jeopardy Clause] does not preclude the Government's retrying a defendant whose conviction is set aside because of an error in the proceedings leading to the conviction is a well-established part of our constitutional jurisprudence." *United States v. Tateo*, 377 U.S. 463, 465 (1964); *see also State v. Lamorie*, 610 P.2d 342, 347 (Utah 1980) ("Reversal and remand for a new trial does not place the accused in double jeopardy where the error giving rise to the reversal is merely trial error, as distinguished from insufficiency of the evidence.").